No. 93-635

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

AUDREY JEAN GUERTIN,

      Plaintiff and Respondent,

-v-

MOODY'S MARKET, INC.
d/b/a/ SUPER 1 FOODS,

      Defendant and Appellant.



FILED

MAY 11 1994

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Twentieth Judicial District,
In and for the County of Lake,
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Don Torgenrud, St. Ignatius, Montana

      For Respondent:

      Thomas Alan Kragh, Rosscup & Kragh, Polson, Montana

Submitted on Briefs:   March 17, 1994

Decided:  May 11, 1994

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a Twentieth Judicial District Court, Lake County, jury verdict for the plaintiff in a wrongful discharge action and an order denying defendant's motion for a new trial. We affirm.

ISSUES ON APPEAL

The following are issues on appeal:

1. Did the District Court err in allowing Guertin to introduce evidence which related to good faith and fair dealing?

2. Did the District Court err in denying Moody's motion for a directed verdict?

3. Did the District Court err by denying Moody's mid-trial oral motion for leave to call Cheryl Rathbun as its witness?

4. Did the District Court err by denying Moody's motion for a new trial due to an alleged quotient verdict?

BACKGROUND

The plaintiff in this action is Audrey Jean Guertin (Guertin), who was employed as a manager of a bakery/deli department by Moody's Markets, Inc. Guertin was employed by Moody's Markets, Inc, to work in its Super 1 Foods store in Polson from January 1988 until October 1991.

The defendant, Moody's Markets, Inc. (Moody's), d/b/a Super 1 Foods, is owned by Leonard Moody and Ralph Smith. Leonard Moody is the general manager of all five Moody's Markets stores. Chuck Moody, Leonard's son, is the store director of the Super 1 Foods store in Polson. Tim McGreevey is the store manager of Super 1 in

2

Polson and Guertin's immediate supervisor. McGreevey, in turn, is supervised by Chuck Moody.

Paul Christianson, the bakery/deli coordinator of United Retail Merchants (URM) was retained to work with Guertin to orient her to her new position. URM is a co-op and food products wholesaler that purchases in bulk from manufacturers and passes on the discount savings to member stores like Moody's Markets. Christianson worked with Guertin to train her concerning equipment set up and maintenance, purchasing, pricing, sales, special promotions, inventory management and management of bakery/deli personnel.

Although unwritten, there is a rule that Moody's employees must undergo a 90 day probationary period. Guertin successfully passed her probation and after her orientation with Christianson, was left to manage the bakery/deli department on her own.

Guertin developed a side line catering business from the bakery/deli department, preparing foods for holidays, weddings and other celebrations. During peak periods of catering, Guertin testified, she would often order extra inventory, which would be stored with the regular inventory. The catering business was run solely by Guertin, in addition to her general management responsibilities.

Guertin provided testimony which demonstrated that she had increasing sales over the three years she worked for Moody's Markets:

1. First Year - $297,793.88
2. Second Year - $323,715.99

3

3. Third Year - $350,454.02

Leonard Moody, Ralph Smith, Chuck Moody and Tim McGreevey thought highly of Guertin, finding her a hard worker, an honest person and a loyal employee. They knew her to be a manager who maintained a successful rapport with the customers of Super 1 Foods.

Employees of Super 1 Foods are evaluated approximately every six months. An employee's merit to the company is the primary consideration in determining whether an employee will receive a raise, with length of service also a consideration. Management testified that an employee can consider themselves to be working at or above expectations if they receive a raise; raises are not, however, automatic.

Guertin testified that she received a raise after each evaluation. She received $8.50 per hour plus benefits at the time she was hired. At the time of her termination, she was earning $11.00 per hour and was receiving additional fringe benefits, including participation in the company's profit-sharing plan.

"[P]rofit sharing is designed for those managers who contribute professionally and directly to the net profit of the store." However, even though Guertin was eligible for the profit-sharing plan, as a practical matter, she was not able to participate in the plan during her first years working in the bakery/deli department because bakery/delis are low profit centers. Management realized that although bakery/delis are low profit centers, their managers work as hard as managers in other higher

4

profit departments and should be rewarded through the profit-sharing program. Therefore, in 1991, Moody's made it easier for bakery/deli managers to participate in a meaningful way in the profit-sharing plan.

There were three goals which had to be met by managers in order to earn extra income through the profit-sharing plan. The three goals included man-hours, gross profit and distribution. The goal of man-hours is a measure of productivity, gross profit measures the department's ability to make a profit and distribution is a measure of product and a display of knowledge. Guertin exceeded all three goals in her first opportunity for meaningful participation in the plan. She earned approximately $1400 and she received half of that amount with the other half being deferred until performance could be assessed for the latter quarters of the fiscal year.

On Monday, October 7, 1991, which happened to be Guertin's day off, she was called into work to help conduct an inventory of the bakery/deli department. Leonard Moody, Ralph Smith, Chuck Moody, Tim McGreevey and Greg Hertz, the CPA/controller of the company, were in the bakery/deli department during the inventory.

The inventory took place during business hours. Any food which was out of code (beyond the date stamped on the product) for even one day was piled in open view to be thrown away. Guertin testified that she had planned appropriate uses for some of the food items which were thrown away that day.

For example, the men threw away frozen cheese which was going

5

to be shredded for use in specialty breads. They threw away fish bought for personal use by Harold "Sarge" Campbell, the head baker. Guertin also testified that they threw away salad which had just arrived on the delivery truck. She reported that many of the food items were beyond the code date but they were frozen, not spoiled. Other food items were going to be placed on a half price table or donated to the local food pantry. (We note that Chuck Moody testified in his deposition and again during trial that Super 1 Foods sometimes intentionally orders food items which are out of date. He testified that out of date does not necessarily mean spoiled.)

After conducting the inventory and piling up food items in view of the customers for later disposal, the men sent Guertin home. She was called back approximately 20 minutes later and directed toward McGreevey's office upstairs where the five men who conducted the inventory had assembled. Leonard Moody informed her that she was being suspended for two weeks.

Guertin testified that she called Leonard Moody on October 17, 1991, and asked if she could come to the store, pursuant to the company's open door policy, and talk about the suspension. Although she called only ten days after her suspension, before the suspension period had lapsed, she was told "no, you're terminated."

She testified that she did not receive written reasons for her suspension and subsequent termination until she went to the unemployment office. Leonard Moody testified that he gave her a copy of the written reasons on the day she was suspended.

6

One reason given for her termination was that state sanitation laws were being broken. However, the county health and sanitation inspectors made unannounced visits to the store every six months. The bakery/deli always received high ratings and it was never cited for any major health violations.

A second reason for termination was a very dirty and unkept department. However, in the three and one-half years that Guertin worked at Super 1 Foods, Chuck Moody never had occasion to inform Guertin that she had a dirty or unkept department. Guertin testified that none of the upper level management people ever told her that the department was dirty or unacceptable.

Although Moody's also cited inventory problems as a reason for Guertin's termination, Chuck Moody testified that he did not specifically discuss inventory problems with Guertin during the weekly managers' meetings. He also testified that a "bell [never went] off about inventory" and "[n]othing as store director appeared to be out of whack to [him]" as far as the bakery/deli inventory was concerned.

DISCUSSION

1. Covenant of Good Faith and Fair Dealing

First, Moody's argues that the Wrongful Discharge from Employment Act precludes any testimony concerning an employer's lack of "good faith and fair dealing." It asserts that the Act preempts any claims arising from "tort or express or implied contract," including good faith and fair dealing. Guertin counters that Moody's failure to make specific and timely objections to the

7

testimony it deemed prejudicial bars its objections to the testimony at this point. Moreover, Guertin did not rely on the covenant of good faith and fair dealing as a theory of liability in the case; she argued that she was terminated without good cause, in contravention of § 39-2-904, MCA.

Rule 103(a)(1), M.R.Evid., provides that:

> a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context....

Nowhere in the transcript is there a specific objection that any testimony was improper because it related to the covenant of good faith and fair dealing. Under Rule 103(a)(1), M.R.Evid., the failure to object in a timely and specific manner waives the objection. However, Moody's asserts that the testimony affected substantial rights of the appellant, and therefore, the "plain error" doctrine should be applied, pursuant to Rule 103(d), M.R.Evid.

Rule 103(d), M.R.Evid., provides that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Nonetheless, the "plain error" doctrine is only to be used in exceptional circumstances. Moreover, a narrow view of the term "substantial rights" is favored. Reno v. Erickstein (1984), 209 Mont. 36, 42, 679 P.2d 1204, 1207. Additionally:

[c]ourts have typically confined the scope of the plain

8

error doctrine to criminal cases, because the right to life and liberty is unquestionably substantial or fundamental. "Plain error" generally involves an act or omission of a more serious nature than "reversible error," and only on rare occasion is the former doctrine invoked in civil cases.

Reno, 679 P.2d at 1207-1208. (Citation omitted.)

We cannot say that substantial rights of the appellant have been affected. Guertin did not plead the covenant of good faith and fair dealing, she pleaded only that she was discharged without good cause. The evidence she presented related to her burden to prove that Moody's reasons for firing her were false, whimsical, arbitrary or capricious, and not for good cause. Also, the trial court did not instruct on the theory of the covenant of good faith and fair dealing; it instructed that Guertin was required to prove that Moody did not have "good cause" to terminate her employment.

Moody cannot complain that the District Court erred in allowing evidence relating to good faith and fair dealing when it did not make a specific and timely objection on the record. Rule 103(a)(1), M.R.Evid. Moreover, the "plain error" doctrine is to be used only in exceptional cases and this case does not warrant invoking the doctrine where Guertin did not plead or argue and the court did not instruct on the covenant. We hold that the District Court did not err in allowing the testimony upon which Moody predicates error.

## 2. Directed Verdict

Second, Moody maintains that the District Court erred when it denied Moody's motion for a directed verdict because Guertin failed to demonstrate that Moody's did not have good cause for her

9

discharge. Guertin states that she offered substantial credible evidence that she satisfactorily performed her job duties and Moody's reasons for discharging Guertin were false, arbitrary and capricious.

Good cause is defined in § 39-2-903(5), MCA, as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." "A legitimate business reason is a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." Buck v. Billings Montana Chevrolet, Inc. (1991), 248 Mont. 276, 281-282, 811 P.2d 537, 540.

Guertin was terminated from her position as the bakery/deli manager of Moody's Market on about October 7, 1991. The reasons cited for her termination were gross lack of product rotation, $2000 to $5000 of unsalable product being used or kept on hand, a very dirty and unkept department and state sanitation rules being broken. Subsequent to the termination, Guertin filed a complaint against Moody's Market, contending that she was discharged without good cause. Moody's contends that during trial, Guertin did nothing more than "deny her employer's explanations for her termination, and claim that the termination was unfair." Moreover, it asserts that "Guertin did not offer evidence of any specific reason for her termination," and therefore, a directed verdict should have been granted as a matter of law. We disagree.

> A motion for a directed verdict is properly granted only in the complete absence of any evidence to warrant

10

submission to the jury, and all inferences of fact must be considered in the light most favorable to the opposing party. [I]f the evidence viewed in a light most favorable to plaintiff indicates reasonable men could differ as to the conclusions drawn from the evidence a directed verdict is not proper.

Britton v. Farmers Insurance Group (1986), 221 Mont. 67, 88, 721 P.2d 303, 317. (Citations omitted.) See also Kestell v. Heritage Health Care Corp. (1993), 259 Mont. 518, 523, 858 P.2d 3, 6.

Our review of the record convinces us that there is evidence to warrant submission of the wrongful discharge claim to the jury. Guertin testified that she was a hard-working, loyal employee and that she had never received any complaints from her employers about her management of the bakery/deli. She also testified that she always received favorable reviews from the health inspectors when they toured the bakery/deli on a semi-annual basis. She stated that she maintained a regular cleaning schedule for the department. She further testified that she maintained a higher inventory than other Moody's stores because she ran a successful catering business for the store on the side. Guertin further explained that she had special uses for some of the food which was discarded at the inventory which led to Guertin's termination. She also testified that she had good relations with store management until her son was terminated for theft and at that time, she began to receive a "cold shoulder" from the company's upper echelon.

The evidence presented by Guertin demonstrates that she was performing her job satisfactorily and it provides a possible motive for her termination for other than good cause. The evidence she presented went to her argument that Moody's reasons for her

11

termination were false, whimsical, arbitrary or capricious. <u>Buck</u>, 811 P.2d at 540. This evidence counters the evidence presented by Moody's to support their contention that they terminated Guertin for good cause.

A district court should only grant a motion for a directed verdict if there is a complete absence of evidence to warrant submission of the issue in question to the jury. <u>Britton</u>, 721 P.2d at 317. In the instant case, reasonable men could differ as to the conclusions which could be drawn from the evidence presented. <u>Britton</u>, 721 P.2d at 317. Guertin provided evidence that she was doing a satisfactory job at Moody's, that its reasons to terminate her were arbitrary or capricious and that perhaps, her son's improprieties at the store were a motivation for her termination. This evidence, viewed in the light most favorable to Guertin, is enough to warrant submission of the wrongful discharge claim to a jury. Therefore, we hold that a directed verdict was not proper in the instant case.

### 3. Denial of Motion to Call Witness

Third, Moody's argues that the District Court erred when it denied Moody's oral mid-trial motion to call Cheryl Rathbun as a witness. Moody's states that Rathbun was originally identified by Guertin as a witness but was later withdrawn from the witness list, but because she was originally listed in the pre-trial order and Moody's had reserved the right to call any of Guertin's witnesses, it should have been able to call Rathbun. Guertin rebuts Moody's argument, stating that she had to delete Rathbun from her witness

12

list and therefore, Moody's should not be able to argue that it should have been able to call Rathbun as a witness.

Cheryl Rathbun was originally listed as a witness for Guertin on the pre-trial order of August 25, 1993. However, the pre-trial order also provides that Moody's objected to the plaintiff calling Rathbun "on the basis of the fact that no disclosure whatsoever was made in answer to discovery of the Plaintiff's intention to call the [witness]." On September 2, 1993, Moody's filed a motion to continue the trial because Guertin failed to disclose certain witnesses. Moody's attempted to locate the witnesses and depose them before trial but one of the witnesses was going to be out of state and Moody's would not be able to depose her before the scheduled trial date. In an effort to maintain the trial date as scheduled, Guertin, on September 3, 1993, responded to Moody's motion, stating that she would delete the names of the three "late" witnesses from the potential witness list for her case in chief. Cheryl Rathbun was one of the witnesses deleted from the potential witness list. Guertin did, however, reserve the right to call Cheryl Rathbun and the other deleted witnesses as rebuttal witnesses, if necessary. Finally, in an order dated September 7, 1993, the District Court denied Moody's motion to continue the trial and deleted the names of Cheryl Rathbun and two other witnesses from the list of plaintiff's witnesses in her case in chief.

Our standard of review for discretionary trial administration rulings is whether the trial court abused its discretion. Steer

13

Inc. v. Department of Revenue (1990), 245 Mont. 470, 475, 803 P.2d 601, 603-604.

In the present case, the District Court did not abuse its discretion in denying Moody's motion to call Cheryl Rathbun as a witness. In response to Moody's motion to call Rathbun, the trial judge stated that "Cheryl Rathbun as a witness, she is not now among those of plaintiff's witnesses that the defendant has a right to call under the catch-all provision of 'any and all of plaintiff's witnesses....'" Further, the trial judge ruled that Moody's could call Rathbun as a rebuttal witness if that was appropriate but:

> Surrebuttal by the defendant is limited to the scope of rebutting any new material that is raised by the plaintiff in her rebuttal. If she puts on no rebuttal, there is absolutely nothing in the nature of new material which would entitle the defendant to surrebuttal.

The trial judge was correct in denying Moody's motion. Cheryl Rathbun was deleted from Guertin's list of potential witnesses to preserve the trial date and Moody's accepted this decision. At that point, Moody's no longer retained the right to call her under the catch-all provision from the witnesses' list, particularly since the name was deleted due to Moody's motion to continue the trial.

The trial judge was also correct in stating that Rathbun could have been called as a rebuttal witness only if new material was raised by Guertin in her rebuttal. Massman v. City of Helena (1989), 237 Mont. 234, 243, 773 P.2d 1206, 1211. Whether proposed testimony is admissible as rebuttal testimony is within the sound

14

discretion of the District Court. Massman, 773 P.2d at 1211.

Moreover, when the trial judge denied Moody's motion to call Rathbun as a witness, Moody's should have made an offer of proof concerning the testimony that would have been elicited by Rathbun. Rule 103(a)(2), M.R.Evid., provides:

> (a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> . . .
>
> (2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Moody's made no offer of proof, thereby not properly preserving the objection to the excluded testimony. In view of the fact that Rathbun was deleted from Guertin's witnesses list, the opportunity to be called as a surrebuttal witness did not arise and in view of the fact that Moody's did not properly preserve its objection by an offer of proof, we hold that the District Court did not err in denying Moody's motion to call Rathbun as a witness.

### 4. Quotient Verdict

Finally, Moody's argues that the District Court erred by denying Moody's motion for a new trial because of the alleged use of a quotient verdict. Guertin argues that she presented nine juror affidavits which stated that although the jury used an averaging procedure as part of their deliberations, the jurors reserved the right to argue to modify the result.

The decision to grant a new trial is within the sound discretion of the trial court and will not be overturned absent a

manifest abuse of discretion. Stanhope v. Lawrence (1990), 241 Mont. 468, 471, 787 P.2d 1226, 1228. The question of whether a jury agreed to be bound by a quotient verdict process is a question of fact; such question will not be set aside unless such findings are clearly erroneous. Stanhope, 787 P.2d at 1228. Findings of fact are not clearly erroneous if they are supported by substantial, though possibly conflicting, credible evidence. Stanhope, 787 P.2d at 1228.

A quotient verdict constitutes grounds for a new trial under § 25-11-102, MCA. Whiting v. State (1991), 248 Mont. 207, 218, 810 P.2d 1177, 1184. Two elements are necessary to create a quotient verdict. First, the jurors must have agreed in advance that the result of the quotient would be their verdict. Whiting, 810 P.2d at 1184. Second, the agreement must be carried into effect. Whiting, 810 P.2d at 1184.

The question then becomes - was there substantial credible evidence to support the trial judge's finding that the jury did not arrive at a quotient verdict. A review of the many affidavits submitted concerning this issue convinces us that the jurors did not agree to a quotient verdict.

Moody's Markets filed the affidavit of John Stark with its October 8, 1993 motion for a new trial. Stark's affidavit stated:

> [t]hat as a result of the inability of the jurors to agree to a fixed amount to such damages the jurors agreed to each submit a damage award independently, the total of which would then be divided by 12, being the number of jurors submitting damage figures, and be bound by that result.

16

However, all nine of the juror affidavits filed by Guertin state that they disagree with the affidavit of John Stark. Each insists he or she was not bound by the results of the procedure described by Stark.

For example, in addition to stating that he strongly disagreed with Stark's conclusion that the jurors agreed to be bound, Chester Zimmer also stated that:

> I always reserved to myself the absolute right to either accept or reject the dollar amount arrived at by this procedure, depending upon whether or not I personally thought it was fair and reasonable.
> There is no way that I would have considered myself to be bound by a result which was unknown to me.

Another juror, Claudia Ray affirmed that:

> My specific recollection is that there was an express understanding among all of us jurors that if anyone disagreed with the result after the result was known, we would discuss it some more, and if anyone had any disagreement, for whatever reason, we would continue to deliberate and vote until we reached an agreement. At no time did I consider myself to be bound to the calculations results ahead of the time they were done, nor did I make any commitment to be bound by the results of the procedure we used as far as the final result is concerned.

Thomas Maestas added:

> After determining the average result, I and the other members of the jury continued to deliberate and state our opinions on what the final verdict dollar amount awarded to Mrs. Guertin should be.

In her affidavit, Ruby Sampson stated the following:

> It was my position that I was free to either accept or reject the results of this procedure, depending upon my own personal feelings. At the same time, I didn't hear anyone say, and I have absolutely no recollection whatsoever of us jurors or me personally agreeing ahead of time that we would be bound by the results.

17

It was my understanding that each of us had the ability to either accept or reject the dollar amount arrived at, depending upon how we individually felt.

Lori Freeman, another juror, reported:

I always reserved to myself the authority of either disagreeing or agreeing with the result of our calculation and of arguing for changing that result to whatever figure I felt was right, and it was my impression in listening to the other jurors that they felt the same way.

Juror Mildred Williams explained:

Both before this procedure was undertaken and after it was completed, I reserved to myself the full right to either accept or reject the result, depending upon what I thought was best.

Finally, Shirley Parker served as one of the jurors and in her affidavit, stated:

There was certainly no intent on my part or anyone else's, that I know of, to be bound by the results before the results were determined. I wanted to know what the final result was before I gave my final approval or disapproval as to what amount of money we should award Mrs. Guertin.

Moreover, John Stark later filed a second affidavit where he recanted the statements in his first affidavit, concluding that:

After careful review and re-consideration of that Affidavit, I am not certain that it is entirely correct in paragraph 4 where it ends with the statement "and be bound by that result."
I cannot say that I was absolutely bound by the result of our mathematical process, having felt that I could object or argue to change the result either higher or lower, as is evidenced by the actual verdict we did return.

After our review of the affidavits and pertinent evidence, we find that substantial evidence exists to support the District Court's finding that the jury was not bound to a quotient verdict.

18

We hold that the District Court did not err in denying Moody's motion for a new trial.

AFFIRMED.

_____ Justice

We Concur:

_____

_____

_____

_____ Justices

19

May 11, 1994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Don Torgenrud
Attorney at Law
P. O. Box 490
St. Ignatius, MT 59865

Thomas Alan Kragh
ROSSCUP & KRAGH, P.C.
410 1st Street East
Polson, MT 59860

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy