No. 04-745

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 13

_____

IN RE THE MATTER OF:

O.A.W., K.A.W., and W.L.W.,

     Youths in Need of Care.

_____

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and for the County of Ravalli, Cause No. DN-03-08,
The Honorable Jeffrey H. Langton, Presiding Judge.

COUNSEL OF RECORD:

    For Appellant M.C.W.:

        Patrick F. Flaherty, Attorney at Law, Great Falls, Montana

    For Appellant K.D.W.:

        David E. Stenerson, Stenerson Law Office, P.C., Hamilton, Montana

    For Respondent State of Montana:

        Hon. Mike McGrath, Attorney General; Ilka Becker, Assistant Attorney
General, Helena, Montana

_____

Submitted on Briefs:  October 24, 2006

Decided:  January 23, 2007

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1    The mother (M.W.) and father (K.W) of O.A.W., K.A.W., and W.L.W appeal the orders of the Twenty-First Judicial District Court, Ravalli County, terminating their parental rights.  We affirm.

¶2    Both M.W. and K.W. raise the following issues on appeal:

¶3    1.   Did the District Court err by admitting hearsay evidence consisting of statements made by the children at the show cause, adjudicatory, and termination hearings?

¶4    2.  Did the District Court err by not making an interim placement of the children with their maternal grandparents?

¶5    Separately, M.W. raises three additional issues which we restate as follows:

¶6    3.   Did the District Court err in finding that M.W.'s Treatment Plan was appropriate?

¶7    4.  Did the District Court err in finding that the condition of M.W. rendering her an unfit parent was unlikely to change within a reasonable amount of time?

¶8    5.  Did the District Court err in denying M.W.'s motion for a continuance of the termination hearing?

BACKGROUND

¶9    M.W. and K.W. have three children which are the subject of this action: two daughters, O.A.W. and K.A.W., and a son, W.L.W.  M.W. also has an older child who lives with M.W.'s parents.  On April 25, 2003, the Department of Public Health and Human Services (DPHHS), Child and Family Services Division (CFS), received a report

alleging that K.W. had molested O.A.W. CFS workers interviewed both O.A.W. and K.A.W. and, as a result of those interviews, determined probable cause existed to suspect the children were in danger of being or had been abused or neglected. The children were removed from the home and placed in an emergency 48-hour hold and later into foster care.

¶10 On May 14, 2003, the District Court held a show cause hearing. At the hearing, the District Court considered out-of-court statements made by the children. On June 2, 2003, the District Court granted CFS temporary investigative authority for 90 days. Pursuant to § 41-3-437, MCA, an adjudicatory hearing was then set to determine if the children were abused or neglected.

¶11 On October 10, 2003, almost three weeks before the adjudicatory hearing, CFS filed a motion to determine the admissibility of hearsay testimony consisting of several statements the children had made concerning the alleged abuse. The District Court deferred ruling on the motion until the adjudicatory hearing which was set for October 28, 2003. At the hearing, after argument on the matter, the court ruled from the bench that the children were unavailable to testify and that videotaped interviews made by law enforcement officer Lewis Barnett, social worker Shelly Verwolf, and Dr. Cindy Miller, a clinical psychologist, were admissible under M. R. Evid. 804(b)(5).

¶12 After the hearing, the District Court determined that K.W. had sexually abused his daughters, that both parents had physically abused and psychologically harmed their children, and that the children were youths in need of care. The District Court ordered that CFS would have temporary legal custody of the children for six months.

¶13    On December 1, 2003, the District Court held a dispositional hearing to consider treatment plans for both M.W. and K.W.  Eleven days later, the District Court approved treatment plans for both parents.

¶14    M.W.'s treatment plan identified five problems and five accompanying goals to address those problems.  With each problem, the treatment plan enumerated several tasks she was required to complete in order to resolve that particular problem.  The first goal of the treatment plan required M.W. to take steps to understand how being sexually assaulted as a child had impacted her ability to parent her own children.  Among her tasks, she was required to address her own psychological issues with a counselor and to demonstrate acceptance that her children had been sexually abused by their father.  M.W. was also to participate in a program for parents of children who had experienced sexual assault and communicate to the children in writing that she believed their allegations against K.W.

¶15    Because M.W. had a history of not caring for the children's basic needs, the second goal required her to attend parenting classes and demonstrate age-appropriate discipline and nurturing techniques with the aid of her counselors.

¶16    The third goal of M.W.'s treatment plan required her to complete a chemical dependency evaluation to determine whether she had any addiction issues.  Because M.W. was facing criminal witness tampering charges for allegedly attempting to persuade O.A.W. to recant her allegations of sexual abuse against K.W., the fourth goal required that those charges be resolved prior to implementing a plan for reunification.

¶17 Finally, because M.W. could not recall having been employed for any significant amount of time in the past, the fifth goal required she maintain steady employment or otherwise demonstrate a financial ability to care for herself and the children.

¶18 In May 2004, DPHHS filed a petition to terminate M.W. and K.W.'s parental rights. At that time both parents declined the District Court's offer to appoint attorneys to represent them, even after they were warned that if they changed their minds the proceedings would not be delayed. They later retained attorneys.

¶19 On September 9-10, 2004, the District Court conducted a hearing on the petition to terminate the parents' legal relationship with their children for failure to comply with their treatment plans. At this hearing, the court took judicial notice of K.W.'s convictions of sexual intercourse without consent and incest committed against both daughters, as well as for tampering with a witness or informant.

¶20 During the termination hearing, the parents raised an additional issue of possibly placing the children with their maternal grandparents or maternal great-grandmother, all of whom lived in North Carolina. The District Court ruled that a hearing on a petition to terminate parental rights was not the place to make such a determination as placement of the children was not an issue before the court at that time.

¶21 On September 23, 2004, the District Court entered its Findings of Fact, Conclusions of Law, and Order Terminating Parental Rights. The District Court found that both parents had failed all five portions of their respective treatment plans and that the conduct rendering them unfit was unlikely to change within a reasonable time. Thus,

the court terminated the parental rights of each parent, pursuant to § 41-3-609(1)(f), MCA.

¶22 Specifically as to M.W., the District Court found she had failed her treatment plan in regard to Problem #1 because, among other things, she failed to meet with her counselors, failed to provide documentation that she had addressed psychological issues stemming from her own sexual abuse, failed to participate in the program for parents of children who have experienced sexual assault, and failed to communicate to her children that she believed them regarding their allegations that K.W. sexually abused them.

¶23 The court found that M.W. had failed her treatment plan in regard to Problem #2 because she did not complete a series of DPHHS-approved parenting classes and failed to demonstrate age-appropriate discipline and nurturing techniques.

¶24 The District Court further found M.W. had failed her treatment plan in regard to Problems #3 and #4 because she did not successfully complete a chemical dependency evaluation and, although the witness-tampering charges against her had been dropped, they could still be re-filed. The court also found M.W. had failed the treatment plan in regard to Problem #5 because she had failed to show that she had obtained employment or that she had found suitable housing for the children.

¶25 Both M.W. and K.W. appeal the orders terminating their parental rights.

STANDARD OF REVIEW

¶26 Our standard of review is found in *In re B.N.Y.*, 2003 MT 241, ¶ 18, 317 Mont. 291, ¶ 18, 77 P.3d 189, ¶ 18:

The decision to terminate parental rights is a discretionary ruling which we review to determine whether the District Court abused its discretion. *In re J.W.*, 2001 MT 86, ¶ 7, 305 Mont. 149, ¶ 7, 23 P.3d 916, ¶ 7. We will affirm findings of fact in parental right termination cases unless the findings are clearly erroneous; that is, they are not supported by substantial evidence, the District Court misapprehended the effect of the evidence, or a review of the record leaves us with the definite and firm conviction that the court made a mistake. *In re A.N. and C.N.*, 2000 MT 35, ¶ 22, 298 Mont. 237, ¶ 22, 995 P.2d 427, ¶ 22. We review conclusions of law in a termination proceeding to determine if those conclusions are correct. *In re E.W.*, 1998 MT 135, ¶ 11, 289 Mont. 190, ¶ 11, 959 P.2d 951, ¶ 11.

¶27 In order for a District Court to terminate parental rights, it must follow a three-step process laid out in § 41-3-609(1)(f), MCA. First, the child must be adjudicated a youth in need of care. Second, the court must determine that an appropriate treatment plan that has been approved by the court has either not been complied with or has been unsuccessful. Finally, the court must determine that the conduct or condition rendering the parents unfit is unlikely to change within a reasonable time.

ISSUE ONE

¶28 Did the District Court err by admitting hearsay evidence consisting of statements made by the children at the show cause, adjudicatory and termination hearings?

¶29 M.W. and K.W. argue the lower court erred by admitting hearsay statements at the show cause, adjudicatory and termination hearings. According to M.W. and K.W., allowing such hearsay into evidence so permeated the proceedings they were denied their constitutional right to due process. We address their argument relating to each hearing in turn.

7

*Show Cause Hearing*

¶30     Contrary to M.W. and K.W.'s assertions, hearsay statements by alleged abused or neglected children are admissible at the show cause hearing: "Hearsay evidence of statements made by the affected child is admissible at the hearing." Section 41-3-432(3), MCA. The District Court did not err in admitting the statements of the children at the show cause hearing.

*Adjudicatory Hearing*

¶31     Hearsay evidence is admissible at an adjudicatory hearing to determine whether the children are abused or neglected, according to the Montana Rules of Evidence. Section 41-3-437(3), MCA. The District Court ruled the children's hearsay statements were admissible at the adjudicatory hearing pursuant to M. R. Evid. 804(b)(5), which excepts a statement from the hearsay rule if the declarant is unavailable as a witness and the statement has "circumstantial guarantees of trustworthiness."

¶32     This Court reviews a district court's evidentiary rulings for an abuse of discretion. *Kiely Const., L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 92, 312 Mont. 52, ¶ 92, 57 P.3d 836, ¶ 92. To reverse a district court's evidentiary ruling for an abuse of discretion, this Court must determine that the district court either "acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Kiely*, ¶ 92 (quoting *Jarvenpaa v. Glacier Elec. Coop., Inc.*, 1998 MT 306, ¶ 13, 292 Mont. 118, ¶ 13, 970 P.2d 84, ¶ 13).

¶33     At the adjudicatory hearing the District Court admitted into evidence the video statements O.A.W. made to Dr. Miller, Police Chief Barnett and social worker Verwolf.

8

Also admitted into evidence were statements made by the other two children, K.A.W. and W.L.W., who did not accuse K.W. of molesting them.

¶34 The District Court set forth in the record the reasons it determined the children were unavailable as witnesses. Its central finding was that it would be extremely traumatic for the children to face their parents to talk about the issue of their abuse and that it could have an adverse effect on their therapy. The District Court noted:

> With regard to whether these children are available to testify, I think they ordinarily would be competent witnesses if we were dealing with a different subject matter, but this particular subject matter is what's the cause of concern, and Dr. Miller has testified that in her opinion, based on her evaluation of the kids, that testimony in a court setting could be extremely stressful to them and could affect their progress in therapy, and if at all possible their court testimony should be avoided. Dr. Miller did testify that their requirement to testify in a court setting could affect the accuracy of their reporting of what happened, too, and that it's more likely that an accurate account of what happened or did not happen to them would be more likely gained in a therapeutic setting than a court setting where they're confronted with their alleged abuser and his supporters and subject to cross-examination by their attorneys.
>
> Dr. Ruggiero testified that it would be very difficult for [O.A.W. and K.A.W.] to testify, and that even without being told that they might have to see or confront their parents or be subject to cross-examination by attorneys, [O.A.W.] was, in [Ruggiero's] words, pretty distraught about the possibility of coming here. And that was merely to see the judge in an office setting. And that [O.A.W.], when confronted with the prospect of seeing a judge in an office setting became very quiet, tearful, struggling and curled physically into her foster mother. [K.A.W.] became very tearful and also went into the fetal position next to her foster mother. Dr. Ruggiero said it would not be in their best interests to testify. The children here have not seen their parents for six months, and she concluded it would be extremely traumatic for them to face their parents to talk about these issues, and that it would – could have an adverse effect on their therapy.

¶35 The court further found that the statements of the children were trustworthy, pursuant to M. R. Evid. 804(b)(5) and its "residual exception,":

9

And having viewed the tapes, I believe that the two interviews in question, in particular, were well-documented and would give the trier of fact in this case the ability to assess the contents of what they're saying for accuracy without the need for cross-examination, and I don't do that lightly, but I think weighing all those factors, I think the truth here could be discerned without subjecting these children to cross-examination or the trauma of facing their parents in court. So I'll find that the children are unavailable as witnesses for this hearing.

¶36 The District Court's finding on this issue was supported by the testimony of Dr. Ruggiero and Dr. Miller. This finding was not arbitrary and was made with conscientious judgment. *See Kiely*, ¶ 92.

¶37 The adjudicatory hearing did not result in the termination of M.W.'s parental rights, but only the determination that the children were abused and neglected and that a treatment plan was necessary to assist the parents in remedying the situation. In addition, both Dr. Miller and Dr. Ruggiero were available for cross-examination by M.W. and K.W.'s attorneys. Thus, the admission of hearsay evidence at the adjudicatory hearing did not result in substantial injustice. *See Kiely*, ¶ 92.

¶38 At the time of the adjudicatory hearing, the parents argued that the determination of whether the children were unavailable to testify, and whether their prior statements could be admitted into evidence, should be made considering the requirements for admission of hearsay set out by this Court in *State v. J.C.E.*, 235 Mont. 264, 767 P.2d 309 (1989) (*overruled in part by State v. S.T.M.*, 2003 MT 221, 317 Mont. 159, 75 P.3d 1257). The District Court considered the requirements of *J.C.E* when it analyzed whether the hearsay statements would be admitted.

10

¶39     In *J.C.E.* this Court faced the issue of whether, in a criminal prosecution alleging incest, out-of-court statements made by a four-year-old alleged victim to her counselor and a social worker could be allowed into evidence.  *J.C.E.*, 235 Mont. at 266, 767 P.2d at 310-11.  This Court recognized that the admission of such hearsay would prohibit cross-examination of the child, thus raising problems under the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution, both of which guarantee a criminal defendant the right to confront the witnesses against him.  *J.C.E.*, 235 Mont. at 268, 767 P.2d at 312.  As a result, this Court determined that a district court must make the following three findings to consider such hearsay under M. R. Evid. 804(b)(5):

> 1. The victim must be unavailable as a witness, whether through incompetency, illness, or some other like reason (e.g., trauma induced by the courtroom setting).
> 2. The proffered hearsay must be evidence of a material fact, and must be more probative than any other evidence available through reasonable means.
> 3. The party intending to offer the hearsay testimony must give advance notice of that intention.

*J.C.E.*, 235 Mont. at 273, 767 P.2d at 315.  These findings are also required to be reduced to writing for the purpose of allowing "[t]his Court to conduct proper review of decisions under Rule 804(b)(5) . . . ."  *J.C.E.*, 235 Mont. at 275, 767 P.2d at 316.

¶40     *J.C.E.*, however, is a criminal case involving not only statements admitted into evidence under the hearsay exception in M. R. Evid. 804(b)(5), but also the constitutional right of an accused to meet the witnesses against him face-to-face.  The result of a finding that J.C.E. had committed a crime was the loss of his liberty.  This is a civil case,

11

however, where the constitutional right to confront witnesses under Article II, Section 24, is not implicated. Section 41-3-422(4), MCA. The result of the finding that these children were abused or neglected was intervention by DPHHS in an attempt to assist the parents and to re-unite the family. Only if re-unification efforts were unsuccessful was there the threat of termination of parental rights. Sections 41-3-422 and 41-3-607, MCA. The health and safety of the children is the paramount consideration in these civil matters. Section 41-3-423(1), MCA. The differences between a criminal case and a civil case are substantial, and the legislature is correct that the Rules of Evidence are sufficient to protect parents' rights at an adjudicatory hearing.

¶41 Even if the requirements of *J.C.E.* were applied to this case, the District Court did not error in determining that the children were unavailable at the adjudicatory hearing and in admitting their statements.

¶42 M.W. and K.W. do not argue that the proffered hearsay was not evidence of a material fact, nor do they argue that it was less probative than any other evidence available through reasonable means, which is the second requirement for admission of hearsay testimony noted in *J.C.E.* 235 Mont. at 273, 767 P.2d at 315. Rather, they challenge the District Court's findings on the first and third requirements of *J.C.E.*, which are that the children were unavailable as witnesses, and that CFS gave advance notice of its intent to rely on hearsay testimony.

¶43 As we stated above, the District Court's finding that the children were unavailable was well-reasoned and thorough. Thus, the first requirement under *J.C.E.* was met.

12

¶44    M.W.'s argument that she was given no advance notice of the State's intention to use hearsay testimony is belied by the record. CFS filed a motion to have the District Court determine the admissibility of hearsay on October 10, 2003, a full 18 days prior to the adjudicatory hearing. The motion listed the hearsay at issue, including statements by the children to social workers, Dr. Miller and Dr. Ruggiero. Because the State filed this motion in advance of the adjudicatory hearing and served both parents, the third finding required by *J.C.E.* was also satisfied.

¶45    The District Court did not err in admitting the statements of the children at the adjudicatory hearing.

*Termination Hearing*

¶46    The parents also argue that the District Court erred by admitting hearsay at the termination hearing. This argument, however, misses the point.

¶47    The record of the termination hearing shows that after Dr. Ruggiero had started to testify concerning treatment of the children, counsel for M.W. objected to such testimony based on hearsay. Also, counsel objected to all of the testimony of Dr. Ruggiero unless M.W. was given the right to cross-examine the children. After discussion and argument, the District Court allowed the children's therapist to testify concerning the treatment of the children, as it was expert testimony concerning past abuse, their progress in therapy, and what was in their best interests for the future. This expert testimony concerning medical diagnosis and treatment, which included the statements the children made to their treating doctor, is clearly admissible under M. R. Evid. 703. This testimony is also admissible under the exception to the hearsay rule found in M. R. Evid. 803(4),

13

concerning statements for purposes of medical diagnosis and treatment. While the testimony was not helpful to the parent's case, it was a description of the children's problems and treatment, which is clearly allowed by the Rules of Evidence. The District Court properly admitted this testimony.

¶48   After the District Court had allowed the testimony of Dr. Ruggiero, over M.W.'s continuing objection, her counsel brought to the District Court's attention that he had subpoenaed the children to testify the following day, and inquired whether such would be allowed. Counsel for DPHHS objected to having the children testify, pointing out to the District Court that at the adjudicatory hearing several months before, the court had found they were unavailable. The District Court correctly analyzed the question as one of relevance and held that the children would not testify, effectively quashing the subpoenas served on them. Thus, the question presented to this Court is not whether hearsay evidence was incorrectly admitted at the termination hearing. Rather, the issue presented is whether the District Court erred in denying M.W. the opportunity to call the children as witnesses to present evidence relevant to her theory of the case.

¶49   M. R. Evid. 103 provides:

(a)  Effect of Erroneous Ruling.  Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .

(2) Offer of Proof.  In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

(b) Record of Offer and Ruling.  The court may add any other or further

14

statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer in question and answer form.

¶50 The District Court ruled that the focus of the case was on the parents, and unless there was some further information presented, the children were not essential witnesses. Counsel for M.W. made no offer of proof giving the District Court any further information concerning what the testimony of the children could prove. Nor was there a later motion to call the children as witnesses because further information making their testimony relevant had been presented.

¶51 The reason for M. R. Evid. 103(a)(2) is to require that if evidence is excluded there must be an offer of proof so that neither the trial court nor this Court has to speculate concerning what the evidence would have been. If counsel for M.W. wanted to impeach some of the testimony of Dr. Ruggiero by presenting the testimony of the children, he was required to so inform the court. If he wanted to elicit testimony that the children missed their mother and maybe even that they wanted to live with her, he was required to make an offer of proof.[1] *Guertin v. Moody's Market, Inc.*, 265 Mont. 61, 71-72, 874 P.2d 710, 716-17 (1994).

¶52 This Court has held that the District Court may exercise its discretion and exclude the testimony of a child as irrelevant in a termination of parental rights case. *In re M.A.W.*, 256 Mont. 296, 315, 846 P.2d 985, 997 (1993). As noted above, to reverse a

---

[1] This evidence, even if available, would have been cumulative. Dr. Ruggiero's notes, which were introduced into evidence, reported that the children had said they wanted to be with M.W. Also, a social worker's notes, introduced into evidence, indicated that the children wanted to see M.W.

15

district court's evidentiary ruling for abuse of discretion, this Court must determine that the district court either "acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Kiely*, ¶ 92. There is no showing in this case that the District Court abused its discretion in excluding the children as witnesses at the termination hearing.

¶53    The District Court did not err in allowing hearsay testimony at the show cause hearing, the adjudicatory hearing or the termination hearing.

ISSUE TWO

¶54    Did the District Court err by not making an interim placement of the children with their maternal grandparents?

¶55    Both M.W. and K.W. claim that the lower court erred by not placing the children with their maternal grandparents in North Carolina.

¶56    Section 41-3-101(3), MCA, provides:

> In implementing this chapter, whenever it is necessary to remove a child from the child's home, the department shall, when it is in the best interests of the child, place the child with the child's noncustodial birth parent or with the child's extended family, including adult siblings, grandparents, great-grandparents, aunts, and uncles, when placement with the extended family is approved by the department, prior to placing the child in an alternative protective or residential facility. Prior to approving a placement, the department shall investigate whether anyone living in the home has been convicted of a crime involving serious harm to children.

¶57    At the request of DPHHS, its North Carolina counterpart commenced an investigation into whether the children should be placed with their maternal grandparents while this matter was proceeding through the Montana District Court. North Carolina authorities conducted an interview with the maternal grandparents. As a result of that

16

interview, North Carolina determined the grandparents did not believe any abuse had taken place. Because of this conclusion, pursuant to its Family Services policy, North Carolina refused to conduct a home study and refused to consider placing the children with the grandparents. Although the record is somewhat unclear about the exact date, the grandparents learned of this decision no later than June 23, 2004.

¶58 At the September 10, 2004, termination hearing, the grandparents testified concerning the North Carolina authorities' investigation. According to the grandfather, he was never interviewed by North Carolina authorities. The grandmother acknowledged that she was interviewed, but claimed that she misunderstood their questions. Specifically, grandmother testified she thought North Carolina authorities were asking whether she had personally seen any abuse of the children take place, not whether she believed the children had been abused.

¶59 Despite having known that North Carolina denied DPHHS's placement request since approximately June 23, 2004, at the latest, the grandparents made no efforts to clear up any misunderstanding until the termination hearing almost three months later.

¶60 The District Court was correct that the termination hearing was the wrong time to address an interim placement of dependant or neglected children. As the District Court noted, by the time of the termination hearing, North Carolina had already denied placement with the grandparents and any attempt by the court to place the children with the grandparents would violate the interstate compact between North Carolina and Montana. The District Court explained:

Well, the way I look at that at this point, the Court would have no legal authority to place these children with the maternal grandparents in light of the fact that the North Carolina authorities have declined to accept jurisdiction under the interstate compact. In fact, it would be an offense to do so, so that's a prerequisite that North Carolina accept the case and they have refused, and there's been no evidence that that's changed.

¶61 As the District Court correctly noted, the grandparents can be considered as candidates to adopt the children. However, the District Court could not force North Carolina to accept supervision over a temporary placement of the children. Under these circumstances, the District Court did not err when it did not place the children with their grandparents.

ISSUE THREE

¶62 Did the District Court err in finding that M.W.'s Treatment Plan was appropriate?

¶63 M.W. argues on appeal that her Treatment Plan was inappropriate. She states that the plan contained a "Catch-22" because it required her to accept that K.W. had sexually abused the children before he was convicted of doing so.[2]

¶64 M.W.'s plan required, in part, that:

[M.W.] will accept and demonstrate an understanding of the effects of sexual abuse on her children with Dr. Ruggiero by January 10, 2004. If

_____

[2] "Catch-22" is a term coined in Joseph Heller's 1961 novel, *Catch-22*, describing a situation in which an individual has to accomplish two actions which are mutually dependent on the other action being completed first. The prototypical "Catch-22," as formulated by Heller, considers the case of an Army Air Force bombardier who wants to escape combat flight duty. In order to be excused, he must submit a medical diagnosis that he is unfit because he is insane. However, according to Army Regulation 22, any sane person would not want to fly dangerous combat missions. By requesting permission not to fly combat missions on the grounds of insanity, the bombardier demonstrates that he is in fact sane, and therefore is fit to fly. Conversely, any flyer who wished to fly combat runs demonstrates that he is insane, unfit to fly and ought to be excused. But insane pilots, who want to fly combat missions, would not submit a request to be excused. And, even if they did, the "Catch-22" would apply, they would be found sane, and the request would be denied.

[M.W.] fails to demonstrate an acceptance that her children were sexually abused by their father, [K.W.], this part of the treatment plan will be considered "failed."

¶65 M.W. asks this Court to reverse the District Court because the treatment plan required her to admit K.W. had abused the children before he was criminally convicted of doing so. This, according to M.W., rendered the plan inappropriate. M.W., however, never specifically raised this argument to the District Court. The closest she came was a vague complaint she made at the December 1, 2003, dispositional hearing, regarding counselor Ross Smith's insistence that M.W. acknowledge K.W.'s abuse, as required by the plan. What M.W. fails to acknowledge is that the District Court, in its November 18, 2003, order specifically found that K.W. had abused O.A.W. and K.A.W. This finding was supported by substantial evidence. At the December 1, 2003, hearing, the District Court advised M.W. that it had already found that K.W. was the perpetrator of the abuse. The judge then warned her that if she did not acknowledge K.W.'s abuse, the odds were that her parental rights would be terminated. Rather than heed this warning, M.W. not only continued to deny that K.W. had abused her daughters, she also refused to comply with any part of her treatment plan.

¶66 In September 2004, at the termination hearing, after K.W. had been criminally convicted of abusing the children, M.W. changed her argument and testified she was unable to accept that K.W. had abused O.A.W. and K.A.W because she had not had the opportunity to talk directly with the children. And, according to M.W.'s logic, when she was unable to accept that K.W. abused the children, it was of no use to try to comply with the other requirements of the treatment plan. While M.W. now suggests that her

19

completion of the plan was predicated on her first admitting K.W. abused the children, nothing in the treatment plan says that her compliance with the plan's other requirements was conditioned on her first accepting that K.W. sexually abused the children. The record reflects the fact that M.W. simply refused to comply with any portion of her treatment plan.

¶67 Relating to Problem #1 of M.W.'s treatment plan, the District Court found that M.W. did not comply with its requirements because she:

> (F)ailed to counsel with Ross Smith, failed to provide documentation from a therapist that she had successfully processed her own issues of sexual assault, domestic violence, low self esteem, dependency, and suicidal ideation, failed to demonstrate an understanding of the effects of sexual abuse on her children with Dr. Ruggiero, failed to arrange for or participate in SAFE's program for parents of children who have experienced sexual assault, failed to complete the written required reports, regarding effects of sexual abuse on the children and family, failed to communicate to her children in writing that she believed them and was supportive of them, failed to remain in monthly contact with the children's therapist, Dr. Ruggiero, failed to participate in any family therapy with Dr. Ruggiero, and failed to keep her social worker apprised as to her residence or intent to move.

¶68 Contrary to M.W.'s portrayal of the facts, this was not an instance in which she was stuck in a "Catch-22" treatment plan, or was set up to fail by a plan that was too severe or too difficult to comply with. Rather, as the District Court found, M.W. made no attempt to offer support to her sexually abused daughters. While M.W. presented evidence to the contrary, the record contains substantial evidence that M.W., all the way through the time of the hearing on the petition to terminate her parental rights, refused to support her children. Based on this record, the District Court found that she continuously chose to believe K.W.'s denial and refused to take steps to heal the wounds he caused. It

is the role of the trial court to weigh the evidence and determine witnesses' credibility and this Court will not substitute its judgment for that of the district court in such matters. *In re V.F.A.*, 2005 MT 76, ¶ 7, 326 Mont. 383, ¶ 7, 109 P.3d 749, ¶ 7.

¶69 The District Court did not err in ordering that portion of M.W.'s treatment plan requiring that she acknowledge K.W. had abused the children. Nor did the District Court err in finding that M.W. had failed to complete her treatment plan.

## ISSUE FOUR

¶70 Did the District Court err in finding that the condition of M.W. rendering her an unfit parent was unlikely to change within a reasonable amount of time?

¶71 In determining under § 41-3-609(1)(f)(ii), MCA, whether the conduct or condition rendering a parent unfit is likely to change within a reasonable time, the court must "assess the past and present conduct of the parent." *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, ¶ 37, 991 P.2d 972, ¶ 37. Consideration of past conduct is necessary simply because "we do not have a crystal ball to look into to make this determination." *In re E.K.*, 2001 MT 279, ¶ 47, 307 Mont. 328, ¶ 47, 37 P.3d 690, ¶ 47 (quoting *M.A.E.*, ¶ 37).

¶72 The District Court heard testimony from CFS social worker Harris that, in her opinion, the treatment plan had been unsuccessful in changing M.W.'s behavior, M.W. had failed to accomplish the goals of her treatment plan, and that she was unlikely to change within a reasonable time. Harris explained to the court, "I feel in this case that we are at the same point we were when the kids were removed, with both of the parents. Their thought process has not changed." Harris also testified that if the children were to

21

remain in the custody of the parents, it would likely result in continued abuse and neglect, and that M.W.'s conduct rendered her unfit to continue parenting the children.

¶73     In addition, the record contains support for the findings of the District Court that M.W. did not complete DPHHS-approved parenting classes, failed to communicate with Dr. Ruggiero on a monthly basis, failed to complete a chemical dependency evaluation, failed to prove that she had obtained employment, did not demonstrate that she had the financial ability to care for herself or her children, and failed to prove that she had obtained suitable, stable housing for herself or her children. Such failures are "conduct" the District Court properly considered in determining whether M.W. was likely to change within a reasonable time. *See In re E.K.*, ¶ 47. The District Court did not err in finding as a matter of fact that M.W. was unlikely to change and become a fit parent within a reasonable amount of time.

### ISSUE FIVE

¶74     Did the District Court err in denying M.W.'s motion for a continuance of the termination hearing?

¶75     At the commencement of the termination hearing on September 9, 2004, M.W.'s counsel orally moved for a continuance, arguing that he was unprepared to proceed because he desired to conduct additional discovery, and that he wished to present the testimony of three members of M.W.'s family, including her parents, but they were unavailable at that time.

¶76     A trial court's decision whether to grant a continuance in an abuse and neglect action is a matter of discretion. The court should consider whether the movant has shown

good cause and whether the continuance would be in the furtherance of justice. *In re H.E.*, 2002 MT 257, ¶ 25, 312 Mont. 182, ¶ 25, 59 P.3d 29, ¶ 25 (citing *In re R.F.*, 2001 MT 199, ¶ 24, 306 Mont. 270, ¶ 24, 32 P.3d 1257, ¶ 24).

¶77 The District Court denied the motion to continue, noting that when the petition for termination had been filed in May 2004, the court had offered to appoint M.W. counsel, but she had refused. The record reflects that at the time the District Court offered to appoint counsel for M.W., it specifically warned her of the potential consequences were she not to retain counsel immediately, including the possibility that her attorney might not be fully prepared. The presiding judge told both M.W. and K.W. that the longer they delayed in obtaining counsel the less time their attorneys would have to prepare, and further advised them that the hearing on the petition would not be postponed if an attorney for either parent said they needed more time to prepare. M.W. and her counsel were clearly warned that they would be required to be ready at the time set for the hearing.

¶78 M.W. has made no showing of how a postponement would have been in the furtherance of justice. The depositions counsel desired were of Shelly Verwolf and Dr. Ruggiero, both of whom had submitted reports that were in the possession of M.W.'s counsel. Also, both had previously testified and had been subject to cross-examination.

¶79 Counsel for M.W. did not provide any affidavits in support of his motion to continue on the grounds of absence of evidence, as the mandatory language of § 25-4-501, MCA, requires. Nor did he present any evidence of what the witnesses he desired to call would have offered had he been given more time.

¶80 The September 9, 2004, hearing certainly did not spring upon an unsuspecting M.W. Under such circumstances we conclude the District Court did not abuse its discretion in denying appellant's motion to continue. *See In re R.F.*, ¶ 27.

¶81 Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE