No. 01-338

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 199


IN THE MATTER OF R.F.,

Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin T. Sweeney, Sweeney & Healow, Billings, Montana

For Guardian ad litem:

Patrick Kenney, Billings, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Helena, Montana, Nancy G. Schwartz, Assistant Attorney General, Child Protection Unit, Billings, Montana; Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: August 30, 2001
Decided: October 4, 2001

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 This is an appeal from an order terminating appellant's parental rights by the Thirteenth Judicial District Court. The father of R.F. (J.F.) appeals the denial of his motion to continue and also the court's reliance on a treatment plan that was submitted to the District Court for approval before being submitted to J.F.'s counsel. We affirm.

## ISSUES

¶2 Did the District Court err by denying Appellant's motion for continuance at the time of trial, thus giving Appellant only 20 days to prepare?

¶3 Did the District Court err in admitting a letter that referred to Appellant's October 2000 treatment plan because the plan was submitted to the District Court for approval prior to being submitted to Appellant's counsel?

## FACTUAL BACKGROUND

¶4 The District Court's Findings of Fact are not disputed by either party in this action. R.F. was ten months old at the time of the termination hearing, and both his natural mother (C. L.) and father (J.F.) were present and represented by counsel.

¶5 The Department of Public Health and Human services (Department) became involved with C.L. in 1999, when her first two children, fathered by another man, were removed from her care. The Department thereafter arranged for C.L. to visit her children, and in September, 1999, C.L. brought J.F. with her on a visit. She identified him as her fiancé and told the Department social worker (Tate) that she was living with J.F. When Tate asked J.F. if he had a criminal background, he responded that he did not. However, upon investigation, the Department learned J.F. had several felony convictions for domestic

abuse. J.F. later admitted to the convictions, but denied that any abuse occurred.

¶6 In November, 1999, at a family group conference regarding her other two children, C. L. announced she was pregnant with J.F.'s child. Despite the Department's work with C.L., she failed to show any progress on her treatment plan, and her first two children remain in foster care. They are not the subject of this appeal.

¶7 After R.F.'s birth in May, 2000, he was placed in protective custody due to concerns about C.L.'s failure to follow through with earlier treatment plans involving her other two children, and the instability of the relationship between C.L. and J.F. In June, 2000, a family group conference was held to review C.L.'s progress, and to include J.F. as R.F.'s father. J.F. and his extended family were invited to attend and participate. J.F. was observed dropping C.L. off for the conference, but he did not stay to attend.

¶8 A plan developed at the family group conference later served as a treatment plan for C. L. and J.F. The District Court approved this plan on June 13, 2000. To facilitate bonding between R.F. and his parents, arrangements were made for C.L. and J.F. to visit R.F. at least three times a week while he was in foster care. In August, 2000, R.F. was placed with J.F.'s mother in Cody, Wyoming, upon J.F.'s request. Arrangements were made for both parents to visit R.F. in Wyoming and for R.F. to travel to Montana to see his parents. By the time of the hearing to terminate parental rights, C.L. and J.F. had visited R.F. approximately five times total. R.F. remains with his paternal grandmother, and is doing well.

¶9 On June 13, 2000, J.F. was arrested for Partner Family Member Assault involving C.L. When Tate asked J.F. about the incident, J.F. admitted pulling C.L.'s hair, but indicated it was in response to her pulling his hair first. When meeting with C.L. two days later, Tate observed that a clump of hair had been pulled out of her head, and also noticed bruising on her arms.

¶10 Despite the Department's efforts, neither C.L. nor J.F. showed any progress in stabilizing their living situation so as to allow R.F. to return to their care. Due to the parents' lack of progress and R.F.'s need for permanency, on September 6, 2000, the Department petitioned the court for permanent custody and an order terminating parental rights of C.L., J.F., and J.S. ( the natural father of the other two children).

¶11 On September 12, 2000, the District Court appointed counsel for J.F. and the

termination of parental rights hearing was set for October 10, 2000. On September 14, 2000, J.F. was personally served with the petition for permanent legal custody and termination of parental rights as well as notice of the hearing. In September, J.F. was once again arrested for Partner Family Member Assault involving C.L., and was released from jail by October 23, 2000.

¶12 Prior to the scheduled October 10 hearing, J.F. discovered that the treatment plan developed at the family group conference in June 2000, lacked a projected time period for completing the objectives, which is necessary under § 41-3-420(2)(c), MCA. To resolve this problem, J.F. and the Department reached an agreement whereby rather than proceeding on the petition to terminate (in regards to R.F.), the Department would change the petition on the record to a petition for temporary custody. In return, J.F. stipulated to an order for temporary legal custody, lasting three months. C.L. and the Department reached a similar agreement. Other than his objection to the lack of a projected time period, J.F. did not object to any part of his treatment plan.

¶13 On October 12, 2000, the District Court declared R.F. to be a youth in need of care within the meaning of § 41-3-102, MCA, and awarded the Department temporary custody of R.F. for three months. This three month period commenced on October 31, 2000, when the District Court issued the stipulation of custody regarding R.F.'s mother, C.L. After the temporary legal custody order was entered, Tate prepared a corrected treatment plan for both C.L. and J.F. and presented the proposed plans to the parents. The District Court, in its Findings of Fact, found that other than the inclusion of expected dates of completion, these treatment plans were similar to the original family group treatment plans from June 2000. Both C.L. and J.F.'s treatment plans contained a warning that failure to successfully complete the treatment plan would result in the Department filing a recommendation to the court "regarding permanency for [R.F.], with termination of parental rights."

¶14 Tate presented the corrected treatment plan to J.F. at the County Detention Facility where he was incarcerated. Although Tate was unsure of the exact date, J.F.'s signature on the plan is dated October 13, 2000. Tate included a memo to J.F. suggesting the possibility that J.F. complete some of the plan's tasks while in jail. After J.F. received the treatment plan, Tate was advised that J.F. may have been unable to read or write. Tate encouraged J.F. to discuss this matter with his attorney. Despite J.F.'s claim that he was illiterate, J.F. signed his treatment plan, and on October 16, 2000, the District Court approved it.

¶15 In addition to presenting the treatment plan to J.F., Tate sent J.F.'s counsel a letter,

dated October 30, 2000, along with a copy of the plan. The letter advised that unless the State heard otherwise, they would assume J.F.'s counsel had no objections to the treatment plan. The letter also informed J.F.'s counsel of his client's claim that he could not read or write. The State did not hear from J.F. or J.F.'s counsel regarding any objection to the plan.

¶16 C.L. and J.F. failed to complete any portion of their treatment plans. Accordingly, on January 30, 2001, the Department filed a petition for permanent legal custody, requesting an order terminating parental rights. The District Court set a hearing date for February 20, 2001. On January 31, 2001, J.F. was personally served with a summons to appear and answer the petition for permanent legal custody and termination of parental rights.

¶17 On the day of the February 20 hearing, J.F., through counsel, made a motion to postpone the trial, alleging he had not received adequate notice of the petition and that he required additional time to prepare. After hearing arguments, the District Court denied the motion, noting this was not a brand new case for which the parties had only 20 days to prepare. The court told J.F., "you had twenty days in which to get witnesses here if you wanted to," adding that the due process rights of the child, "who is in some sort of limbo," must also be considered.

¶18 During the hearing, it was unrefuted that J.F. did not complete any portion of his treatment plan, which was in effect from October 11, 2000 to December 31, 2000. The Department identified concerns with J.F.'s chemical dependency, anger control, spouse/ partner abuse, and lack of stable living environment. J.F. presented no evidence that he had done anything to address the concerns of the Department. Notably, J.F. does not challenge the District Court's finding that he had not completed the treatment plan, nor does he contend that the plan was not appropriate. Therefore, further discussion of the specifics of the plan are not necessary.

¶19 J.F. objected at the hearing to the admission of the October 30, 2000 letter from the Department to J.F.'s counsel, because it referenced J.F.'s October 2000 treatment plan. J.F. asked the District Court to strike the October 2000 Treatment Plan because it was not presented to J.F.'s counsel prior to being presented to the District Court. The trial court admitted the letter and gave J.F. an opportunity to provide legal argument in support of his motion in his proposed findings and conclusions.

¶20 On March 15, 2001, the District Court entered its Findings of Facts and Conclusions of Law. The trial court concluded the Department was not required to present J.F.'s

counsel with a copy of the treatment plan prior to submitting it to the District Court for approval. The court held it was in the best interests of R.F. to terminate the parental rights of both C.L. and J.F. and grant permanent legal custody of R.F. to the Department.

## STANDARD OF REVIEW

¶21 We review discretionary trial court rulings such as rulings on motions for continuances to determine if the court abused its discretion. *Inquiry into M.M.* (1995), 274 Mont. 166, 169, 906 P.2d 675, 678 (citing *Montana Rail Link v. Byard* (1993), 260 Mont. 331, 337, 860 P.2d 121, 125). Further, this Court's standard of review of rulings on the admissibility of evidence is whether the district court abused its discretion. *State v. Castle*, 1999 MT 141, ¶ 11, 295 Mont. 1, ¶ 11, 982 P.2d 1035, ¶ 11 (citing *State v. Stringer* (1995), 271 Mont. 367, 374, 897 P.2d 1063, 1067).

## DISCUSSION

### Issue 1

¶22 Did the District Court err by denying Appellant's motion for continuance at the time of trial, thus giving Appellant only 20 days to prepare?

¶23 On the day of the hearing, J.F. moved for a continuance, seeking additional time to prepare. After hearing oral arguments from J.F., C.L., the guardian ad litem and the State, the District Court denied the motion. The court noted that J.F. had 20 days to arrange for witnesses to appear on his behalf. The court also referred to the importance of considering the due process rights of the children, who are "in some sort of limbo while the case proceeds." J.F. contends the District Court erred in denying his motion for a continuance, claiming 20 days to prepare for a termination of parental rights hearing was fundamentally unfair.

¶24 A motion to postpone a trial on the grounds of the absence of evidence shall be made only upon an affidavit showing materiality of the expected evidence, and that due diligence has been used to procure it. Section 25-4-501, MCA; *Matter of T.M.M.* (1988), 234 Mont. 283, 289, 762 P.2d 866, 869-70; and *In re Custody of C.C.* (1985), 215 Mont. 72, 75, 695 P.2d 816, 817-18 (overruled on other grounds by *In re Marriage of Miller* (1992), 251 Mont. 300, 825 P.2d 189). The court may exercise its discretion to grant a postponement on grounds other than absence of evidence, upon a showing of good cause and in the furtherance of justice. Section 25-4-503, MCA; *Custody of C.C.*, 215 Mont. at

75, 695 P.2d at 818. In *Custody of C.C.*, the District Court's denial of a motion to continue was upheld, where appellant failed to submit an affidavit regarding any missing evidence, and did not provide any good cause as to other grounds to postpone the trial. In that case, we also noted the appellant was aware of the trial date and the purpose of the trial. We held the mandatory language of § 25-4-501, MCA, requires an affidavit if there is a claim of absence of evidence. *Custody of C.C.*, 215 Mont. at 75, 695 P.2d at 818. Moreover, in *T. M.M.*, we specifically held that "no abuse of discretion occurs when a court denies a motion for a continuance, for the purposes of obtaining additional evidence, if no such affidavit is filed in support of the motion." *T.M.M.*, 234 Mont. at 289, 762 P.2d at 869-70.

¶25 Here, J.F. received notice of the hearing on January 30, 2001. However, J.F. had notice of the Department's intentions four months earlier, when on September 14, 2000, the Department served him with its original petition to terminate parental rights. The District Court noted that this was not a brand new case to either C.L. or J.F., and that they had plenty of time to get witnesses to the hearing.

¶26 In his argument in support of his motion to continue, J.F.'s counsel contended that there were people who could come forward to testify on behalf of J.F. should the motion for continuance be granted. However, J.F. did not provide any affidavits in support of his motion to continue, as the mandatory language of § 25-5-401, MCA, requires, nor did he present any evidence of what he would have offered had he been given more time. Moreover, J.F. failed to show any good cause beyond his argument of fundamental unfairness.

¶27 As the State argues, J.F.'s complete failure to comply with the terms of the treatment plan support the conclusion that there is no good cause available to J.F. He had 20 days from the date he was notified of the final hearing--and more than four months from the original petition--to prepare for the hearing to terminate his rights. The February 20, 2001 hearing certainly did not spring upon an unsuspecting J.F. We therefore conclude the District Court did not abuse its discretion in denying appellant's motion to continue.

## Issue 2

¶28 Did the District Court err in admitting a letter that referred to Appellant's October 2000 treatment plan because the plan was submitted to the District Court for approval prior to being submitted to Appellant's counsel?

¶29 We review a district court's ruling on the admissibility of evidence for an abuse of discretion. *Castle*, at ¶ 11. The test for abuse of discretion is "whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 27, 304 Mont. 356, ¶ 27, 22 P.3d 631, ¶ 27 (citing, *Jarvenpaa v. Glacier Elec. Co-Op., Inc.*, 1998 MT 306, ¶ 13, 292 Mont. 118, ¶ 13, 970 P.2d 84, ¶ 13).

¶30 J.F. contends the Department policy of providing its treatment plan to a parent's counsel prior to submitting the plan to the court was not followed in this case. J.F. also alleges he could not read the treatment plan presented to him in jail. The State counters that there is no legal requirement to present a treatment plan to a parent's counsel prior to a District Court's approval of that treatment plan. We agree.

¶31 If a child is adjudicated a youth in need of care, terminating a parent's legal relationship with his child requires that "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(f), MCA; *See*, *Inquiry Into M.M.*, 274 Mont. 166, 173, 906 P.2d 675, 679-80 (where we specifically noted that § 41-3-609, MCA, allows court approval of a treatment plan without a parent's signature). In addition, § 41-3-420, MCA, which describes the contents of a treatment plan, notes that every treatment plan must include the signature of the parent(s) or guardian, *unless* the plan is ordered by the court (emphasis added). Section 41-3-420(2)(e), MCA. As there is no legal requirement for parent approval prior to submitting a treatment plan to the district court, by implication there is no requirement that a parent's counsel receive and approve a proposed treatment plan prior to submission to the court.

¶32 We also note that J.F. and his counsel had ample time prior to the hearing to raise objections to or concerns with the treatment plan. When Tate presented J.F. with the treatment plan in October 2000, she advised him to speak with his attorney if he had problems reading the plan or had objections to it. In addition, the State's October 30, 2000 letter informs J.F.'s counsel that the enclosed treatment plan was submitted to the court for signature, and that unless the State hears from him, the State will assume he has no objections to the plan. The State did not hear from J.F. or J.F.'s counsel regarding any objections to the treatment plan. Presumably, had there been legitimate objections to the plan, they would have been raised by J.F. or his counsel upon their review of the plan.

¶33 As to J.F.'s claim of illiteracy, there was no evidence presented to the court that J.F. cannot read. The District Court concluded that J.F.'s claim of illiteracy is "questionable at best," relying on the lack of evidence presented and its own observations of J.F.'s demeanor and behavior when presented with written documents by opposing counsel. Based upon the foregoing, we conclude the trial court did not act arbitrarily or beyond the bounds of reason when it admitted the State's October 30, 2000 letter, and when it denied the Appellant's motion to strike the treatment plan. Accordingly, we find the District Court did not abuse its discretion in relying on the October 2000 treatment plan.

¶34 We therefore affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JIM RICE

/S/ W. WILLIAM LEAPHART