DA 12-0648

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 191

IN THE MATTER OF:

D.A. and M.A.,

Youths in Need of Care.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. CDN 10-064 and 10-065
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Elizabeth Thomas, Attorney at Law; Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, Pamela P. Collins, Assistant Attorney General; Helena, Montana

Theresa L. Diekhans, Assistant Attorney General, Child Protection Unit; Great Falls, Montana

Submitted on Briefs:   March 6, 2013

Decided:   July 16, 2013

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     The Eighth Judicial District Court, Cascade County terminated T.A.'s (Mother's) parental rights to her two daughters D.A and M.A. (collectively "Children"). Mother claims that the Department of Health and Human Services (Department) failed to comply with the provisions of the Indian Child Welfare Act (ICWA) and various other federal and state requirements. We affirm.

¶2     We address the following issues on appeal:

¶3     *Whether the Department made sufficient active efforts to reunify Mother and the Children to satisfy ICWA?*

¶4     *Whether the Department provided sufficient evidence that reunification of Children with Mother would cause serious physical or emotional damage to the Children?*

¶5     *Whether the District Court properly determined that Mother had stipulated to the treatment plan?*

¶6     *Whether all stipulations in ICWA involuntary termination proceedings must be reduced to writing?*

## FACTS

¶7     T.A. is the natural mother of M.A. and D.A. M.A. is nine years old and D.A. is seven years old. The Children and Mother are enrolled members of the Chippewa Cree Tribe.

¶8     Mother has a long history of illegal drug use that includes methamphetamine, marijuana, and benzodiazepine. Mother tested positive for methamphetamine in August 2005 when she was six months pregnant with D.A. The Department removed M.A. from Mother's care the day after Mother's positive methamphetamine test.

¶9     The District Court, in an earlier proceeding, had adjudicated M.A. a youth in need of

2

care and granted temporary legal custody (TLC) of M.A. to the Department. The Department removed D.A. from Mother's care at birth in November 2005 due to Mother's methamphetamine use while pregnant with D.A. The Department restored custody of M.A. and D.A. to Mother in 2007 after Mother successfully completed a treatment plan.

¶10 Mother also has a long history with the Department. Child Protective Services (CPS) has received at least twelve referrals regarding Mother since 2004. CPS undertook eight child investigative reports during that period. These referrals involved Mother's other child too. The Department required Mother to attend treatment after Mother had left her daughter, A.A., at a daycare in October 2008. A.A. was around five months old at the time. The Department agreed to A.A.'s placement with her birth father with whom she still resides.

¶11 The Children's maternal aunt and uncle agreed to care for the Children so that Mother could attend treatment after the incident with A.A. Mother walked away from that treatment program after two days. She chose instead to live at a rescue home without the Children. The Children remained with the aunt and uncle until April 2010 when the uncle informed the Department that the aunt and uncle no longer could care for the Children.

¶12 The Department placed the Children into protective custody on April 23, 2010. The Department filed a petition for emergency protective services, adjudication as youths in need of care, and TLC for the youths on April 28, 2010. The Department originally assigned Amanda Scott (Scott), a child protective specialist, to the case. Scott tried unsuccessfully to contact Mother through Mother's sister, Mother's probation officer, M.A.'s grandmother, and M.A.'s father. Scott finally contacted Mother in June 2010.

¶13    The District Court held a show cause hearing and adjudicatory hearing on the Department's petition on May 25, 2010. The Department notified the Chippewa Cree Tribe of the proceeding. The Tribe did not respond. Mother appeared through counsel as she was in custody.

¶14    The Department by this point had placed M.A. with a grandparent and D.A. with a maternal aunt. Mother's counsel stipulated to the Department having temporary investigative authority (TIA) due to Mother's satisfaction with the Children's placement. Counsel contested TLC because of Mother's absence. The Department agreed to limit its petition, for the time being, to TIA. The court inquired whether the Department needed to present the testimony of an ICWA expert before the court could grant TIA. The Department argued that Mother could waive the need for the ICWA expert. Mother's counsel stipulated to waive the expert's testimony. The court approved the Children's current placements and granted the Department temporary investigative authority for 90 days.

¶15    The court held a show cause and adjudicatory hearing on the Department's petition to convert the TIA to TLC on July 13, 2010. Mother appeared by telephone and was represented by counsel. The court informed Mother that she would have to undergo a treatment plan to regain custody of the Children if she agreed to the Department's TLC. Mother agreed.

¶16    The Department had not yet completed Mother's treatment plan. The Department represented that it would have Mother's treatment plan ready within 20 days. Mother's counsel again stipulated to waive ICWA expert testimony. Mother's counsel also agreed to

4

treat this hearing as a dispositional hearing, on the condition that Mother could object to the contents of the treatment plan once the Department completed it. The Department agreed to allow Mother 10 days to object to the treatment plan once the Department filed the treatment plan with the court.

¶17 The court ordered the Children adjudicated youths in need of care on July 23, 2010. The court found that "[t]he treatment plan for the Mother, [T.A.], is reasonable and appropriate." The District Court also stated that Mother had "reviewed the proposed treatment plan and she had signed the treatment plan and has already begun to complete the requirements of the treatment plan."

¶18 The Department's completion of Mother's treatment plan took longer than the 20 days that the Department had represented. The Department finally submitted Mother's treatment plan to the District Court on November 1, 2010. By this time, Mother had been transferred from the Cascade County Detention Center to Passages in Billings, and finally to Butte's Pre-Release Center. Mother filed no objection to the content of the treatment plan.

¶19 Mother remained in the Butte Pre-Release Center for almost a year. Throughout this period, Mother maintained contact with the Children, the Department, and her parole officer. Mother also completed a psychological evaluation, attended parenting classes, and remained employed as required by her treatment plan.

¶20 Dr. Susan Day, a licensed clinical psychologist, performed Mother's psychological evaluation. Dr. Day recommended that Mother demonstrate for six months that she could maintain her sobriety outside a monitored setting. Mother would need to be discharged from

Pre-Release in order to meet this recommendation. Dr. Day also recommended that Mother be required to establish a stable home, sobriety, and work for six continuous months in order to demonstrate that Mother was sufficiently stable to parent the Children. Mother never completed these goals.

¶21 Mother discharged from Pre-Release in Butte on November 22, 2011. She moved into the Pre-Release's Alternative Reporting Component (ARC). ARC operates as a transitional living program that "provides a continuum of care" for those offenders who transition from Pre-Release back into the community. ARC afforded Mother the opportunity to establish a residence of her own. Mother still had to comply with certain rules and conditions of release, including those in her treatment plan.

¶22 The Department transferred D.A. from a foster home in Great Falls to a foster home in Butte in October 2011. The Department intended that D.A. would transition into Mother's home while Mother completed ARC and met her release conditions. Scott worked with Joslin Swartz (Swartz), a Department child protection specialist in Butte, to facilitate D.A.'s transfer.

¶23 Swartz met with Mother on numerous occasions while Mother lived in Butte. Swartz met with Mother both at Swartz's office and at Mother's home. Swartz learned during one home visit that Mother had a live-in boyfriend. Mother falsely told Swartz the boyfriend was at a funeral in Washington. The boyfriend actually was in jail in Spokane, Washington.

¶24 Department policy prevented D.A.'s placement in Mother's home until the Department had investigated the boyfriend's background. Swartz informed Mother that the

boyfriend needed to provide fingerprints and to execute a release that would allow the Department to investigate his background. Swartz gave Mother the information release and fingerprint forms. The boyfriend submitted fingerprints, but he refused to sign the release. The boyfriend continued to live with Mother.

¶25 Mother and boyfriend went drinking on New Year's Eve 2011. The boyfriend physically assaulted Mother that night and he was arrested for partner family member assault. The Department of Corrections (DOC) placed Mother in the Enhanced Supervision Program on January 25, 2012, for 90 days due to Mother's violation of the terms of both her parole and her parenting plan.

¶26 The Department filed a petition for permanent legal custody and termination of parental rights on February 3, 2012. Mother absconded from her parole in March 2012. Mother remained on the lam until June when she was arrested and detained for having absconded.

¶27 M.A. lived with her paternal grandmother throughout most of these proceedings. The guardian ad litem continually has reported to the court that M.A. remains "well taken care of" by her grandmother. D.A. has been moved a number of times. Various relatives have cared for her and the Department has placed her in foster homes in Box Elder, Great Falls, and Butte. The Department returned D.A. to the foster home in Great Falls after the effort to reunite D.A. with Mother in Butte failed.

¶28 The District Court held a permanent legal custody and termination of parental rights hearing on August 29, 2012. Mother appeared with counsel. Dr. Day, Scott, Swartz, Tricia

Jory (Mother's parole and probation officer in Butte), and Anna Fischer (an ICWA expert) testified for the Department.

¶29    The District Court granted the Department's petition to terminate Mother's parental rights on September 28, 2012. The District Court determined beyond a reasonable doubt that Mother had failed to comply with the treatment plan or show any indicia that she could begin to comport with the treatment plan within a reasonable period. The District Court determined beyond a reasonable doubt that Mother's continued custody of the Children likely would result in serious emotional or physical damage to the Children. Mother appeals.

**STANDARD OF REVIEW**

¶30    We review for abuse of discretion a district court's termination of parental rights. *In re B.M.*, 2010 MT 114, ¶ 14, 356 Mont. 327, 233 P.3d 338. We determine whether a district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *In re B.M.*, ¶ 14. Where ICWA applies, we will uphold a district court's termination of parental rights if a reasonable fact finder could conclude beyond a reasonable doubt that continued custody of the child by the parent likely would result in serious emotional or physical damage to the child. *In re I.B.*, 2011 MT 82, ¶ 18, 360 Mont. 132, 255 P.3d 56.

**DISCUSSION**

¶31    *Whether the Department made sufficient active efforts to reunify Mother and the Children to satisfy ICWA?*

¶32    The District Court terminated Mother's parental rights pursuant to § 41-3-609(1)(f),

8

MCA. The parties have stipulated that ICWA applies to Mother's termination proceedings. *See* 25 U.S.C. § 1903(4) (2006). ICWA requires the Department to make active efforts toward reunification. 25 U.S.C. § 1912; *In re I.B.*, ¶ 25.

¶33    Mother points to the lack of visitations with the Children as evidence of lack of active efforts by the Department for reunification. Mother contends that the Department should have provided more in-home services and worked more actively with Mother to attain reunification after Mother had re-engaged with the Department in June 2012. Mother also argues the Department's documents contain insufficient use of the term "active efforts."

¶34    Mother fails to acknowledge the impact that her incarceration and her own actions had on the availability of visitations with the Children. These proceedings extended from April 23, 2010, through the termination hearing on August 29, 2012. Mother was incarcerated, or otherwise under supervision and monitoring, throughout these 28 months with the exception of the two separate occasions when she absconded from her parole. Consequentially, we must consider Mother's incarceration, her supervised status, and her absences while on the lam when we evaluate whether the Department undertook active efforts to reunify Mother with the Children. *See A.A. v. Dept. of Fam. and Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

¶35    Mother's detours through the various levels of incarceration and supervision placed significant roadblocks in the Department's ability to reunite Mother and the Children. The Department filed a petition for emergency protective services for the Children in April 2010. Mother had left the Children with their aunt and uncle almost two years earlier. Mother had

absconded from her parole. Department personnel finally found Mother in June 2010 at the Cascade County Detention Center. Authorities soon transferred Mother to Passages in Billings. Authorities transferred Mother from Passages to Pre-Release in Butte in September or October 2010. Mother received parenting classes at both Passages and Pre-Release.

¶36 The Department scheduled visitations between Mother and D.A when they lived in the same city. In fact, the Department moved D.A. to a foster family in Butte while Mother was at the Butte Pre-Release Center and later ARC. Swartz helped Mother receive services in Butte and monitored D.A. in foster care in Butte.

¶37 Swartz met with Mother to devise a plan to return D.A. to Mother's care. Swartz visited Mother's ARC program home. Swartz learned of Mother's live-in boyfriend during one of these visits. Mother failed to return the boyfriend's background check release. Mother knew that the Department policy would prevent home visits between Mother and D.A. until the Department had received the release. Swartz tried unsuccessfully to set up a meeting with the boyfriend.

¶38 Swartz tried to help Mother address her transportation problems. Mother needed a valid driver's license so that she could get D.A. to school, daycare, and therapy. Mother missed some of her visits with D.A. due, in part, to Mother's lack of a valid driver's license. Swartz helped Mother gather the proper paperwork to obtain a license. Swartz also helped Mother with daycare referrals so that Mother's reunification with D.A. would not require Mother to stop working. Mother never obtained the driver's license or followed up on the daycare referrals.

¶39     Swartz discussed with Mother the opportunity for Mother and the Children to be reunited through the "Michel's House" program in Billings. Michel's House would have offered Mother added support with parenting and attaining sobriety. Mother was "adamant" in her opposition to attending Michel's House.

¶40     Swartz also supervised visits between Mother and D.A both at Swartz's office and at Mother's home. Swartz testified that Mother was "unsure how to interact with [D.A.]" and "had to be prompted on a lot of things." Swartz also discussed with Mother the Intermountain program. Intermountain could have provided in home therapy sessions to Mother and D.A. Intermountain requires parent child reunification in order to enroll. Mother never achieved reunification.

¶41     D.A.'s return to Great Falls halted visits between Mother and D.A in Butte. Swartz testified that D.A. had exhibited behavior problems at her foster home in Butte. Specifically, Swartz testified that D.A. had started to exhibit sexual behaviors, was hitting other children, almost killed a kitten, and was yelling and screaming. These actions led D.A.'s Butte foster parents to fear that D.A.'s behavioral problems put at risk an infant who was in their home. No other foster homes were available in Butte.

¶42     Mother's treatment plan required random urinalysis testing. Swartz tried to help Mother set up random urinalysis testing when Mother was placed in the ARC program. Mother never complied.

¶43     The Department attempted to arrange a meeting with Mother after Mother returned to supervised status in June 2012. The Department wanted to assess Mother's plans for

complying with her treatment plan. Department personnel called to verify Mother would attend. Mother's phone line had been disconnected. Mother failed to show up for the meeting.

¶44 The record establishes beyond a reasonable doubt that the Department undertook active efforts to reunite Mother and the Children as required under ICWA. The Department attempted to work around Mother's incarceration, her supervision, and her chemical dependency problems. The Department's active efforts matched the Department's words in its desire to facilitate reunification.

¶45 *Whether the Department provided sufficient evidence that reunification of Children with Mother would cause serious physical or emotional damage to the Children?*

¶46 ICWA requires the "testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (emphasis added); *see also* § 41-3-609(5), MCA. Nothing in 25 U.S.C. § 1912(f) requires a court to make this determination solely from the testimony of the ICWA expert. In Montana, at minimum, evidence in the record of serious physical or emotional damage must include an ICWA expert's opinion that serious emotional or physical damage to the child would result if the child is left in the parent's custody. *In re K.B. and T.B.*, 2013 MT 133, ¶ 30, 370 Mont. 254, 301 P.3d 836. The court may review the evidence to supplement the expert's conclusion regarding likely emotional or physical damage. *See* 25 U.S.C. § 1912(f).

¶47 Fisher qualifies as an ICWA expert. Fisher met with Mother. Fisher spoke with Scott

about the case. Fisher testified that she had "all the information necessary" to evaluate whether reunification posed a risk to the Children. Fisher opined that continued custody by Mother likely would result in serious emotional and physical damage to the Children. Fisher testified that it is not "within the norms of [an] Indian family for a mother to work this long and not get it together and be able to then parent her children."

¶48 Fisher noted that Mother has not had her children for a single weekend since the Department became involved with the Children's custody matter. No social worker has been able to observe Mother actually parenting the Children except in a highly supervised setting. This lack of observation prevented the Department from achieving one of the goals stated in Mother's treatment plan—to provide the Department the opportunity to assess the strengths, needs, and concerns of the family.

¶49 The parties submitted this case before our recent decision in *K.B. and T.B.* ¶¶ 29-30. The ICWA expert there testified only that the children would be "at risk" if placed in Mother's custody and asserted that termination would be "in the best interest of the children." *K.B. and T.B.*, ¶ 29. The Department failed to ask the ICWA expert "whether Mother's continued custody would likely result in serious emotional or physical damage." *K.B. and T.B.*, ¶ 29. We determined that the ICWA expert's testimony failed to comply with the requirements of ICWA, when read in conjunction with Montana's Parent-Child Relationship Termination Act of 1981. *K.B. and T.B.,* ¶¶ 26-30.

¶50 Here the ICWA expert expressly affirmed that "continued custody by [Mother] would likely result in serious emotional or physical damage to the children." The ICWA expert

13

further provided the basis for her opinion in that Mother's inability to shake her addiction leaves her unprepared to care for the Children. Mother failed to provide safe and secure housing for the Children. Mother proved to be an unreliable caregiver for the Children as she absconded from her parole on several occasions. Fisher's testimony satisfied the minimum requirements for an ICWA expert's testimony in a termination proceeding in Montana. *K.B. and T.B.*, ¶ 30.

¶51 Ample other evidence in the record further supported the District Court's determination that the Children's continued custody by Mother likely would result in serious emotional or physical damage to the Children. Mother's drug use and her inability to beat her drug addictions despite multiple treatment programs constituted the primary source of concern. Evidence in the record shows a pattern of Mother relapsing when stressful situations emerge. Most recently, in 2012, Mother absconded from her probation, restarted drinking and drug use, and associated with a known felon after she learned that the Department intended to file a petition to terminate Mother's parental rights. Treatment programs repeatedly have proven to be ineffective to prevent Mother from relapsing into alcohol and drug abuse.

¶52 Mother began her conditional release on November 21, 2011. Jory testified that Mother violated both the terms of her parole and her probation by drinking less than a month later. Mother absconded from her conditional release on March 17, 2012. Mother contacted Jory while on the lam. Mother admitted to the use of drugs and alcohol. Mother admitted to Jory that she was with a known felon. Mother promised to return. Mother failed to return.

¶53 Mother has demonstrated an inability to maintain compliance with her treatment program as her level of supervision decreases. Mother transitioned from the Passages program, to Butte's Pre-Release program, to the ARC program. Mother's level of supervision decreased at each new stage. Mother's progress towards reunification with D.A. and M.A. decreased as her level of supervision decreased. The evidence in the record supports the District Court's determination that Mother's custody of the Children would pose a likelihood of physical and emotional harm to the Children.

¶54 *Whether the District Court properly determined that Mother had stipulated to the treatment plan?*

¶55 Mother argues that the "circumstances surrounding the adoption of [her] treatment plan undermine a determination that the plan was appropriate." The District Court issued an order that stated that Mother had stipulated to a treatment plan three months before any treatment plan had been presented to Mother. The District Court's order further determined the treatment plan to be reasonable and appropriate without having seen the completed treatment plan.

¶56 Mother argues that § 41-3-443(2)(e), MCA, requires Mother's signature in order for the treatment plan to be valid. Mother misapprehends the language of the statue. Section 41-3-443(2)(e), MCA, requires that a treatment plan contains a signature of the parent "*unless* the [treatment] plan is ordered by the court" (emphasis added). *See also In re R.F.*, 2001 MT 199, ¶ 31, 306 Mont. 270, 32 P.3d 1257. The District Court ordered Mother's

15

treatment plan.

¶57 Under these circumstances, we look to the treatment plan itself to determine whether the treatment plan is reasonable and appropriate. Mother makes no argument that the treatment plan contains unreasonable or inappropriate provisions. Mother made no objection in the District Court to any specific term of the treatment plan. Mother agreed at the show cause hearing on July 13, 2010, that she had 10 days after the Department filed the plan with the District Court to raise any objections. Mother stipulated at the show cause hearing that she would abide by the treatment plan unless she raised an objection to the plan. Mother made no objections to the treatment plan at any time before the Department filed its notice to terminate Mother's parental rights. The District Court correctly determined that Mother had stipulated to the terms of the treatment plan.

¶58 *Whether all stipulations in ICWA involuntary termination proceedings must be reduced to writing?*

¶59 Mother urges this Court to reconsider its decision in *In re J.M.*, 2009 MT 332, 353 Mont. 64, 218 P.3d 1213. ICWA's § 1913(a) requires that a parent's "voluntary consent" to terminate parental rights be reduced to writing in voluntary ICWA termination proceedings. *See* 25 U.S.C. § 1913(a). We determined *In re J.M.* that the writing requirement in § 1913(a) has no applicability to non-voluntary termination proceedings. *In re J.M.*, ¶ 19. We decline Mother's request to reconsider our holding in *In re J.M.*. ICWA's 25 U.S.C. § 1913(a) applies only to a "voluntary consent" to terminate. *See* 25 U.S.C. § 1913(a); *In re J.M.*, ¶ 19; *In re Welfare of M.G.,* 201 P.3d 354 (Wash. App. 2009).

¶60    Affirmed.

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ PATRICIA COTTER