IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-483

Filed 02 May 2023

Burke County, No. 18 JT 177

IN THE MATTER OF: N.D.M.

Appeal by Respondent-Father from order entered 3 March 2022 by Judge Burford A. Cherry in Burke County District Court. Heard in the Court of Appeals 3 April 2023.

> *Amanda C. Perez for Appellee Burke County Department of Social Services.*
>
> *Manning, Fulton & Skinner, P.A., by Michael S. Harrell, for Appellee Guardian ad Litem.*
>
> *Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender Jacky L. Brammer, for Appellant Respondent-Father.*

COLLINS, Judge.

Respondent-Father appeals from the trial court's order terminating his parental rights to his son, Nathan.[1] The dispositive issue on appeal is whether the trial court erred by finding and concluding that Burke County Department of Social Services ("DSS") provided active efforts toward reunification in compliance with the Indian Child Welfare Act ("ICWA").[2] Because DSS failed to provide active efforts

---

[1] We use a pseudonym to protect the juvenile's identity. *See* N.C. R. App. P. 42.
[2] This appeal does not involve the termination of Nathan's Mother's parental rights.

toward reunification within the meaning of ICWA, we reverse the order terminating Father's parental rights to Nathan and remand the matter to the trial court for further proceedings.

## I.    Procedural and Factual Background

DSS filed a petition on 19 August 2018 alleging that Nathan was a neglected and dependent juvenile.  Supporting these allegations, the petition further alleged that on 18 August 2018, DSS received a report that Nathan had been abandoned by Mother's boyfriend at a public safety office at Mother's direction; Mother was suffering from substance abuse and could not identify an alternate safety provider for Nathan; Mother was a member of the Monacan Indian Tribe; and Nathan's putative father, Father, was incarcerated.  DSS obtained nonsecure custody of Nathan on 19 August 2018.

The trial court held adjudication and disposition hearings on 18 October 2018. The trial court found, in part, that Nathan was eligible for membership in the Monacan Tribe and ICWA applied to his case, and that Father had "submitted to DNA testing which confirmed that he is the biological father of the juvenile."  The trial court further found that DSS had made active efforts to prevent the breakup of the family by, among other things, communicating with respondent parents and monitoring their status.  Upon facts stipulated to by the parties, including Father, the trial court adjudicated Nathan neglected and dependent by written order entered 1 November 2018.  The trial court ordered that Father not have visitation during his

incarceration and that he enter into an out-of-home family services agreement and complete the following:

> a. Submit to a comprehensive clinical assessment and follow recommendations;
>
> b. Submit to a substance abuse assessment and follow recommendations;
>
> c. Submit to random drug screens;
>
> d. Complete a parenting class and demonstrate skills learned;
>
> e. Obtain and maintain a legal means of income;
>
> f. Obtain and maintain transportation;
>
> g. Obtain and maintain stable housing.

Custody of Nathan was continued with DSS.

After a review hearing on 7 February 2019, by written order entered 7 March 2019, the trial court found that Father was currently incarcerated and had not entered into a case plan or engaged in any services, and that DSS had made active efforts to prevent the breakup of the family by, among other things, DNA testing, communicating with respondent parents, and monitoring their status. Father was ordered to enter into an out-of-home family services agreement and complete certain requirements, and was awarded no visitation.

After a permanency planning review hearing on 30 May 2019, by written order entered 27 June 2019, the trial court found that Father had been released from incarceration but had yet to enter into a case plan or engage in services. The trial court found that DSS had made active efforts to prevent the breakup of the family by,

among other things, communicating with respondent parents and monitoring their status. The trial court again ordered Father to enter into an out-of-home family services agreement and complete certain requirements, and again ordered that Father have no visitation.

After a permanency planning review hearing on 9 January 2020, by written order entered 23 January 2020, the trial court found as follows: Father had been released from incarceration on 8 February 2019, rearrested on 22 February 2019, and reincarcerated on 19 June 2019; Father had not engaged in any services; and DSS had engaged in active efforts to prevent the breakup of the family by, among other things, communicating with respondent parents, "[i]dentifying appropriate services to assist parents to overcome barriers," and "[m]onitoring the parents' status[.]" The trial court concluded that a primary plan of adoption with a secondary plan of reunification was the most appropriate plan and Father was ordered to have no visitation.

After a permanency planning review hearing on 23 July 2020, by written order entered 20 August 2020, the trial court found that Father was incarcerated and had not entered into an out-of-home family services plan and that DSS had made active efforts to prevent the breakup of the family. Father was ordered to have no visitation.

On 3 December 2020, DSS filed a termination of parental rights ("TPR") petition, alleging that grounds existed to terminate Father's parental rights based on the following: neglect; willfully leaving Nathan in foster care for more than twelve

months without showing reasonable progress in correcting the conditions that led to Nathan's removal; being incapable of providing proper care and supervision such that Nathan is a dependent juvenile; and willful abandonment. *See* N.C. Gen. Stat. § 7B-1111(a)(1), (2), (6), (7) (2022). Also on that date, DSS prepared and filed a Notice of Termination of Parental Rights under the Indian Child Welfare Act. On 21 January 2021, DSS filed an amended TPR petition to include the ground that Father's parental rights with respect to another child had been terminated and he lacked the ability or willingness to establish a safe home. *See id.* § 7B-1111(a)(9).

After numerous continuations for various reasons, the trial court held a hearing on the TPR petition on 6 December 2021. By written order entered 3 March 2022, the trial court terminated Father's parental rights. The trial court found, among other things, that Father had not completed any of the court-ordered services recommended by DSS; had failed to enter into a case plan; had not engaged in any programs while incarcerated; and, "[d]espite his inability to engage in many services, []Father still had access to the social worker and failed in any respect to engage with the Department during his incarceration or to otherwise establish or maintain a parental relationship with the juvenile." The trial court also found that DSS had engaged in active and reasonable efforts to reunify Nathan with Father. The trial court concluded that all five grounds alleged in the petition existed to terminate Father's parental rights and that termination was in Nathan's best interests.

Father timely appealed.

## II.   Analysis

Father first argues that the trial court erred by finding and concluding that DSS provided active efforts to prevent the breakup of the family, as required by ICWA.

We review de novo the trial court's determination that DSS provided active efforts toward reunification within the meaning of ICWA. *See In re A.P.*, 260 N.C. App. 540, 818 S.E.2d 396 (2018), *disc. review denied*, 372 N.C. 296, 827 S.E.2d 99 (2019). Due to the paucity of North Carolina case law involving ICWA, we look for guidance from jurisdictions such as Alaska, Montana, Oklahoma, South Dakota, and Washington that regularly address issues involving ICWA.

The decision to terminate parental rights in this case is governed by both state and federal statutes. North Carolina standards for terminating parental rights are provided in Chapter 7B of our General Statutes, which allows the trial court to terminate parental rights if it finds by clear, cogent, and convincing evidence that one or more grounds for terminating a parent's rights exist and that terminating the parent's rights is in the juvenile's best interest. N.C. Gen. Stat. §§ 7B-1109–1111 (2022). In addition to the state requirements, Nathan's case is governed by the more stringent protections of ICWA.[3] *See* 25 U.S.C. § 1903(1)(ii)(2022); 25 U.S.C. § 1903(4); *In re E.J.B.*, 375 N.C. 95, 100, 846 S.E.2d 472, 475 (2020). ICWA was passed

> to protect the best interests of Indian children and to

---

[3] The applicability of ICWA is undisputed in this case.

>promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902 (2022). *See In re E.J.B.*, 375 N.C. at 98-100, 846 S.E.2d at 474-76 (giving a detailed background on ICWA).

ICWA provides that a party seeking to terminate an individual's parental rights must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2022). The active efforts requirement applies in situations that involve the termination of the rights of Indian and non-Indian parents alike. *See* 25 C.F.R. § 23.2 (2022) (defining "active efforts" to include efforts to help the "Indian child's parents"); *In re Adoption of T.A.W.*, 383 P.3d 492, 500 (Wash. 2016) (ICWA active efforts are "premised not on the Indian status of the parents but is instead based on whether the child is an Indian child."); *C.J. v. State*, 18 P.3d 1214 (Alaska 2001) (ICWA applied based on the tribal affiliation of the children's mother).

Although not defined by ICWA, the United States Department of the Interior, through the Bureau of Indian Affairs,[4] issued a final rule in 2016 providing the

---

[4] Pursuant to the statutory authority in 5 U.S.C. § 301; 25 U.S.C. §§ 2, 9, 1901-1952.

following definition of "active efforts" and a non-exhaustive list of examples of what

may constitute active efforts:

> Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:
>
> > (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
> >
> > (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
> >
> > (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;
> >
> > (4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;
> >
> > (5) Offering and employing all available and

culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

25 C.F.R. § 23.2. "[T]he sufficiency of 'active efforts' will vary case-by-case and the final rule's definition of active efforts retains a state court's discretion to consider the facts and circumstances of each case." *In re E.L.*, 502 P.3d 1049, 1068 (Kan. App. 2021) (citing 81 Fed. Reg. 38,778, 38,791 (2016)).

"[T]he practical circumstances surrounding a parent's incarceration–the difficulty of providing resources to inmates generally, the unavailability of specific

resources, and the length of incarceration–may have a direct bearing on what active remedial efforts are possible." *A.A. v. Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (citation omitted). However, "neither incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts[.]" *Id.* (brackets and citation omitted).

Furthermore, there is a distinction between passive and active efforts. *See* 81 Fed. Reg. 38,778, 38,790 ("[W]here an agency is involved in the child-custody proceeding, active efforts involve assisting the parent through the steps of a case plan, including accessing needed services and resources. This is consistent with congressional intent-by its plain and ordinary meaning, 'active' cannot be merely 'passive.'"). On this distinction, the Alaska Supreme Court explained:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, active efforts are where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.

*Pravat P. v. Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011) (brackets and citation omitted). Oklahoma appellate courts have drawn a similar distinction between active and passive efforts, while also recognizing that a parent's incarceration significantly affects the scope of active efforts the State can provide. *See In re W.P.*, 516 P.3d 263, 269 (Okla. Civ. App. 2022); *In re E.P.F.L.*, 265 P.3d 764, 772 (Okla. Civ. App. 2011); *In re J.S.*, 177 P.3d 590, 593 (Okla. Civ. App. 2008).

Here the trial court made the following pertinent findings and conclusions

regarding the efforts made by DSS to prevent the breakup of the Indian family:

> 123. [DSS] has worked with the family since August 19,
> 2018 to reunify the family and return the juvenile to the
> home. The efforts have been unsuccessful due to the lack
> of progress of the respondents.
>
> . . . .
>
> 170. [DSS] engaged in active and reasonable efforts to
> reunify the juvenile with the Respondent-Mother including
> referrals for parenting classes, requesting random drug
> screens, referrals for comprehensive clinical assessments,
> attempts to meet with Respondent-Mother on a monthly
> basis, [and] attempt[s] to locate service providers within
> the geographical area of her residence.
>
> . . . .
>
> 174. [DSS] engaged in active and reasonable efforts to
> reunify the juvenile with the []Father including attempts
> to reach out to [Father] on a regular basis, complete DNA
> screening to establish paternity, formulating a case plan
> and requesting that he complete services.
>
> 175. [DSS] also provided the additional active efforts to
> take the necessary steps to secure tribal membership for
> the juvenile and by using ICWA placement preference to
> conduct an ICPC on [tribe members] for potential
> placement. [DSS] also provided active efforts to secure
> approval for continued unlicensed placement for the
> juvenile in the placement chosen by the tribe after that
> placement's foster care license expired.
>
> . . . .
>
> 188. The court makes the following additional findings of
> fact beyond a reasonable doubt.
>
> > a. Active efforts, in the context of the

prevailing social and cultural conditions and way of life of the Monacan Indian Nation, have been made by [DSS] and available family and tribal services and been used to reunify the family; however, the risk of serious emotional or physical damage to the juvenile [ ] is still present if the child were returned home.

Father challenges findings 123, 174, and 188.[5]

Father first argues that the portion of finding 174 which states, "DSS attempt[ed] to reach out to [Father] on a regular basis[,]" is unsupported. Regarding DSS's efforts to reach out to Father, the DSS Social Worker testified:

[SOCIAL WORKER:] So we were trying to reach out to [Father] through the court system. It -- with his being incarcerated and then not knowing where he was when he was outside of it, it was more difficult. We did contact [Father] in the beginning and did DNA screening to ensure that [Nathan] was his child. . . . The only times that I've ever had contact with [Father] would happen at court.

The DSS Social Worker did not testify as to any attempts made by DSS to contact Father outside of sending DNA testing materials to him and speaking to him in court. There is no other record evidence as to DSS's attempts to contact Father. Accordingly, the portion of finding 174 that "DSS attempt[ed] to reach out to [Father] on a regular basis" is unsupported.

---

[5] Father also challenges corresponding findings "[t]hroughout the underlying court file." However, as Father did not appeal from those orders, we do not address those challenges. Father further challenges findings not directly relevant to his argument on active efforts. We address only necessary findings in relation to termination of parental rights orders. *In re T.M.B.*, 378 N.C. 683, 687, 862 S.E.2d 632, 636 (2021).

Father further argues the trial court's conclusion in Finding 188, subsection a, that "[a]ctive efforts . . . have been made by [DSS]," is unsupported. Father specifically argues that DSS's efforts in providing him with paternity testing, formulating a case plan, and requesting that he complete services did not constitute "active efforts." Father also challenges Finding 123, wherein the trial court found DSS's efforts had been unsuccessful due to Father's lack of progress, to the extent it "states or implies DSS provided active or reasonable efforts to [Father] during the case[.]" Because these findings relate to the determination of what constitutes active efforts, they are more appropriately labeled conclusions of law and we review them de novo. *See In re M.R.D.C.*, 166 N.C. App. 693, 697, 603 S.E.2d 890, 893 (2004).

At the termination hearing, the DSS Social Worker testified as follows:

> [DSS ATTORNEY:] And in the few periods of time when [Father] was not incarcerated, did he contact you in order to let you know that he wasn't incarcerated and was ready to sign and enter into a case plan?
>
> [SOCIAL WORKER:] No he did not.
>
> [DSS ATTORNEY:] Did he ever contact you to ask for referrals?
>
> [SOCIAL WORKER:] No.
>
> [DSS ATTORNEY:] And during the time that he was incarcerated, did he ever ask or call and talk to you about potentially doing any of these services while he was incarcerated?
>
> [SOCIAL WORKER:] No.
>
> [DSS ATTORNEY:] To your knowledge did he ever attempt to reach out to prison officials to see if he could do any of these services while he was incarcerated?

[SOCIAL WORKER:] No.

. . . .

[DSS ATTORNEY:] Has he communicated with you regarding any programs that he could take while in prison to help his situation and assist him in providing appropriate care for the juvenile?

[SOCIAL WORKER:] No.

When asked about the availability of programs in prison that could have satisfied his court-ordered obligations, Father testified he did not complete any such programs in prison because none of them had been available to him, and that an inmate "ha[s] to go through processes to be signed up for classes like that if [the prison has] them."

Father's incarceration for much of the history of this case surely had "a direct bearing on what active remedial efforts [were] possible." *Dep't of Family & Youth Servs.*, 982 P.2d at 261 (citation omitted). However, his incarceration did not relieve DSS "of its duty under ICWA to make active remedial efforts[.]" *Id.* Although DSS was able to send Father a paternity test in prison, DSS made no other effort to contact him via fax, mail, or in person while he was incarcerated. Although DSS "formulat[ed] a case plan," the formulation of a plan is merely a passive effort. *See Pravat P.*, 249 P.3d at 271. There is no record evidence that DSS actively did anything to assist Father through the steps of the plan and with accessing or developing the resources necessary to satisfy the case plan. *See* 25 C.F.R. § 23.2. While DSS cannot dictate what services Father may receive in prison, there is no

record evidence that DSS communicated with Father or prison staff to ascertain the availability of prison programs to help Father achieve the goals of the case plan. Father was denied visitation with Nathan throughout the entire case and there is no record evidence that DSS made any effort to facilitate telephone or written communication between Father and Nathan. Furthermore, DSS made no effort to locate or communicate with Father during the time he was not incarcerated.

The Guardian ad Litem ("GAL") cites a string of cases involving incarcerated parents to support its position that "[Father's] contention that under ICWA incarcerated parents are entitled to the same 'level' of effort at reunification as parents who are not incarcerated has been flat out rejected by the majority of courts that have addressed this precise issue." However, the cases cited by the GAL are readily distinguishable from the present case in that in every one of those cases, despite the fact that the parent was incarcerated and the scope of available options was narrowed, some active efforts were still undertaken. *See In re D.A.*, 305 P.3d 824, 827, 829 (Mont. 2013) (Mother received parenting classes in two different detention settings. The Department of Health and Human Services scheduled visits between Mother and D.A., her younger child. A Department child protection specialist helped Mother receive services while in a pre-release program and met with Mother to devise a plan to return D.A. to Mother's care.); *People ex rel. D.G.*, 679 N.W.2d 497, 502 (S.D. 2004) ("[W]hen assessing what options are available to prepare the parent for the return of a child, incarceration narrows the available options.

Father was referred to drug and alcohol classes, parenting courses, independent living and management courses at the penitentiary and received regular contact from the caseworker. Under these circumstances, which included father's incarceration, DSS's efforts were active and reasonable. DSS cannot be faulted for father's criminal choice which limited its ability to return the child."); *In re E.P.F.L.,* 265 P.3d 764, 767, 770 (Okla. Civ. App. 2011) (Various assessments, referrals, classes, and services were provided to father in prior case that "were designed to remedy the same problems that are at issue in this case." Furthermore, father received a gas voucher, a referral to a substance abuse treatment program, and transportation of the children to the jail to visit him.). *See also People ex rel. S.H.E.*, 824 N.W.2d 420, 424 (S.D. 2012) ("While he was incarcerated, Father attended two different therapy classes, took antidepressants daily, and was on a waiting list for drug and alcohol treatment. Father also wrote DSS five letters, requesting pictures and updates of the children and teleconferencing so he could talk to the children. In response, DSS sent Father court reports, three letters, and some pictures. DSS also sent Father a parenting packet and postage-paid envelopes. As a result, Father sent thirty-four letters to the children. Finally, DSS facilitated a visit between Father and the children while Father was in the Pennington County jail, completed two case plan evaluations, and included Father in concurrent planning meetings.").

Moreover, this is not a case where DSS's efforts were frustrated by Father's "demonstrated lack of willingness to participate in treatment." *Bob S. v. Dep't of*

*Health & Soc. Servs.*, 400 P.3d 99, 107 (Alaska 2017) (citation omitted). To the contrary, Father made some showing that he was engaged. When DSS faxed Father his paternity results in prison, Father immediately signed and returned them as instructed. Father attended almost every court date in this matter, as evidenced by the trial court's findings in its various orders and the numerous applications and writs of habeas corpus ad testificandum in the record. Additionally, Father specifically requested current photographs of Nathan at the permanency planning hearing in August 2021. Father was in court again for TPR continuances in late August, late September, late October, and mid-November 2021. On 27 November 2021, Father wrote a letter to the trial court informing it that DSS still had not given him current him pictures of his son. Father was finally given a photograph of Nathan at the TPR hearing on 6 December 2021.

Some states consider efforts provided to the non-incarcerated parent in determining whether DSS provided active efforts to the family. For example, the Montana Supreme Court reasoned, "Since 'active efforts' are designed to prevent the breakup of the Indian family, it is appropriate for a court to consider efforts provided to the other parent of the child when evaluating the total 'active efforts' and whether they were unsuccessful." *In re A.L.D.*, 417 P.3d 342, 345 (Mont. 2018) (citation omitted). Here, even considering the efforts provided to Mother, by excluding Father from all active efforts, we cannot say that DSS provided active efforts to prevent the breakup of Nathan's family.

Accordingly, the trial court's conclusion that DSS provided active efforts to prevent the breakup of Nathan's family is not supported by the trial court's findings of fact. The trial court thus erred by terminating Father's parental rights to Nathan.

## III.   Conclusion

We conclude that the trial court erred by finding that DSS provided "active efforts to prevent the breakup of the Indian family," as required by 25 U.S.C. § 1912(d). Therefore, we reverse the termination of parental rights order as to Father and remand the matter to the trial court for further proceedings.

REVERSED AND REMANDED.

Judges CARPENTER and WOOD concur.